UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

       - against -                     Docket No. 13-cr-950 (TPG)

PETER PHILLIP NASH

               Defendant.

_____

## SENTENCING MEMORANDUM ON BEHALF OF
## DEFENDANT PETER PHILLIP NASH

Andrew J. Frisch
Jeremy B. Sporn
The Law Offices of Andrew J. Frisch
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 285-8000

May 12, 2015

## Introduction

Peter Nash, 42 years-old with no prior arrests, should be sentenced to time-served. A dual citizen of Australia and the United Kingdom, Mr. Nash was an award-winning counselor for intellectually-challenged adults in Brisbane, Australia, before his arrest in December 2013 on a Southern District warrant seeking his extradition based on this case. He was detained in Brisbane from December 2013 until his extradition to New York in June 2014, and has since been detained at the Metropolitan Correctional Center ("MCC"). Mr. Nash has no friends and family in the United States, and his friends and family overseas have been unable to visit him because of the prohibitive cost of travel and, in the case of his elderly parents in Britain, because their health does not permit a Transatlantic trip. Mr. Nash has no assets of any sort, except a devoted fiancée in Brisbane (to whom he was days away from proposing at the time of his arrest) and a solid network of friends, including clinical psychologists with whom he previously worked, eagerly awaiting the opportunity to support his commitment to a drug-free life.

Mr. Nash turned to the website known as Silk Road, the subject of this case, looking for social connection and to feed his emerging addiction to cocaine and Ecstasy, all stemming from severe work-related stress. For about ten months, Mr. Nash moderated a "chat forum," separate from but associated with Silk Road, and used money earned in "bitcoins," the alternate currency used on the website, to buy more drugs for himself. Mr. Nash did not profit from drug sales, and did not participate in drug transactions, except for personal use. Mr. Nash's only connection with the Silk Road people that the government has identified as his conspirators was through the Internet; he never met nor knew the identities of the people who managed and administered the website, nor did he ever meet or know the people on the site who sold drugs.

When Mr. Nash was arrested in Brisbane, FBI agents accompanying Australian officers acknowledged that his role in Silk Road was minimal, and, indeed, he is listed last in the indictment and, as the Presentence Report notes, earned the least amount of money of those charged. PSR ¶ 52. Mr. Nash consented to his extradition to the Southern District, and has since proffered with the government, truthfully disclosing his complete knowledge about Silk Road, thereby qualifying for a downward adjustment under the so-called "safety valve" provision, as the PSR notes. PSR ¶¶ 65, 111. Mr. Nash told the government that he knew nothing about the subject of the second count of the indictment against him, charging computer hacking, and the government has since represented to defense counsel that it will dismiss that count.

The circumstances of Mr. Nash's confinement have been, and will continue to be, more onerous than for the typical defendant, which the Court should consider in determining if any further incarceration is necessary. Mr. Nash is not only far away from loved ones who are unable to visit him, but he was gratuitously assaulted by guards at the Brisbane facility where he was held awaiting extradition, as described in greater detail below. While the United States is not responsible for the conduct of rogue Australian officers, Mr. Nash was in their custody only because of the Southern District warrant seeking his extradition.

More, because Mr. Nash is not a United States citizen, he would likely be designated by the Bureau of Prisons to a private contract facility, where inmates are denied the types of programs, rehabilitative opportunities and degree of medical care which are provided for United States citizens. Mr. Nash has been a model inmate in Brisbane and the MCC, assisting his fellow inmates and earning virtually every available recognition, as described in greater detail below.

Because the government elects to treat Mr. Nash as a narcotics conspirator in the traditional sense and seeks to hold him accountable for the entire expanse of Silk Road's cyberspace drug sales, Mr. Nash elected to plead guilty to the indictment without a plea agreement, with the hope that the Court will appreciate his unique circumstances and see the wisdom of imposing a sentence of time served. By rejecting the government's plea agreement, Mr. Nash is not bound by any range under the Sentencing Guidelines, nor has he waived any sentencing argument.

A sentence of time served would do no harm to the government's legitimate interest in Silk Road. To the contrary, the government's prosecution of Mr. Nash amply alerts people in the most remote corners of the globe that even addicted professionals like Mr. Nash with no prior arrest, moderating a chat forum for social connection and obtaining drugs for personal use, risk extradition to the Southern District and eighteen total months in custody, isolated from family and friends. Imprisoning Mr. Nash any longer would be more than necessary to meet the goals of sentencing.

A.    PSR Objections

Paragraph 18: Mr. Nash objects to the characterization of his participation as "customer support staff." In his capacity as a chat forum moderator, Mr. Nash interacted with other users of Silk Road, but did not engage in a "customer support" function. Further, the PSR states that chat forum moderators were paid a minimum of approximately $50,000 in Bitcoins, but Mr. Nash was paid a total of about $25,000 in Bitcoins.

Paragraph 19: The PSR characterizes Mr. Nash as "the primary moderator on the Silk Road discussion forums" but he was not the primary moderator. All subsequent references to Mr. Nash as the "primary" moderator should be struck.

Paragraph 40: The PSR should reflect that the chats moderated by Mr. Nash were located on a different server and were distinct from the actual Silk Road

3

marketplace, and that buying and selling on the chat forums were strictly prohibited and did not occur.

Paragraph 51:  We do not believe there is a factual basis for the assertion that Mr. Nash would report to the website's principal any suspicion that a chat forum user was actually an undercover law enforcement agent.

Paragraph 52:  For moderating the chat forum, Mr. Nash was paid $1,000 per week in Bitcoins at the time of his arrest, but began moderating the chat forum for no compensation, and then for $500 a week, which only then increased to $1,000.

Paragraphs 53, 61:  Mr. Nash objects to the government's calculations as to quantity for the reasons advanced herein.  While Mr. Nash acknowledges that the website involved the quantities noted in the PSR, we believe that a more fair and reasonable calculation would rest on the weight of the narcotics with which he was personally involved, of which we believe a rough approximation is 200 grams of cocaine and 25 grams of MDMA.  To the extent the government seeks to hold Mr. Nash accountable for quantities distributed prior to Mr. Nash's entry into the conspiracy in January 2013, we do not believe the Court should consider them in fixing sentence.  Even apart from the mitigating role adjustment, the government's view overstates Mr. Nash's culpability and results in a disproportionate and unnecessary sentence.

Paragraph 54:  Contrary to the PSR, Mr. Nash did not act as an administrative assistant, and in fact rejected an invitation by the website's principal to act as administrator.  The PSR should note Mr. Nash's remove from other areas of the Silk Road website, his lack of privileges and access, and that he had nothing to do with other goods or services offered on the site generally.

Paragraph 56:  This paragraph should state that Mr. Nash purchased controlled substances for personal use.

Paragraph 57:  Mr. Nash's plea allocution, as discussed herein, establishes his awareness that the Silk Road website in the aggregate involved the distribution of the quantities of narcotics reported in the PSR, but the quantity in which he directly participated was approximately 200 grams of cocaine and 25 grams of MDMA.

Paragraphs 64, 67:  Mr. Nash objects to the Guideline enhancements for mass marketing and sophisticated laundering, only one of which was included in the government's *Pimentel* letter, for the reasons stated below.

4

Paragraph 83: The paragraph refers to Mr. Nash's mother by her maiden name, Traynor, but she is now Jean Nash.

Paragraph 85: Upon his release, Mr. Nash intends to return to Brisbane and reside with his fiancee, though he will immediately travel to his parents' home in United Kingdom if he is sentenced to time served.

Paragraph 91: The reference to Mr. Nash's expenditure for marijuana use should be changed to 20 UK pounds at times or periodically, not monthly as the PSR incorrectly states.

Paragraph 92: The time frame for Mr. Nash's cocaine usage should reflect that he stopped using cocaine upon emigrating to Australia from the United Kingdom in 2007. He began using cocaine again occasionally around 2011. His cocaine use grew in 2012. When he was experiencing problems at work and associated high levels of stress, it increased and was the most severe into 2013.

B.     Mr. Nash's History and Characteristics

With this written submission and accompanying letters in support of Mr. Nash, we submit a video containing statements of four people who know him very well, but are unable to appear at sentencing:

1.     Dr. Jonathan Mason, a clinical psychologist in Queensland, Australia, who supervised Mr. Nash's work;

2.     Dr. Paul Oxnam, a clinical psychologist from New Zealand who worked with Mr. Nash in Queensland;

3.     Dr. Claire Ryan, Mr. Nash's fiancée in Brisbane; and

4.     Ms. Donna Lorenz, a friend of Mr. Nash's from Sydney.

Mr. Nash worked as a counselor for intellectually-disabled adults, often in or facing jail, for Australia's Forensic Disability Services, with the twin goals of support and rehabilitation. His commitment to the human rights of people with intellectual disabilities and

5

reducing the use and impact of seclusion and restraints as a methodology, contributed to his receiving a prestigious award from the Minister of Disability Services.  Exhibit A (Mason).

Mr. Nash was born in the United Kingdom and graduated from the University of Greenwich in 1996 with a degree in nursing for those with mental handicaps, and has subsequently earned an additional degree in psychology relating to learning disabilities.  Exhibit B.  Mr. Nash has been working with people with mental and physical disabilities for over twenty years, in multiple positions and capacities, administrative, clinical and managerial.  He emigrated to Australia in 2007, became a dual Australian citizen and worked as a Senior Manager of the Forensic Disability Service for Australia's regional government.  Mr. Nash's impressive resume, as well as the diplomas he earned, are attached as Exhibit B.

Unfortunately, Mr. Nash's devotion to helping others helped fuel his involvement in Silk Road.  Mr. Nash's work with special needs clients was inherently demanding and isolating, as he was on call 24 hours a day and spent substantially all of his time with people of limited capacity who were dependent on him for their needs and security.  Mr. Nash's involvement with Silk Road coincided with a supervisory change at his job, resulting in a less supportive work atmosphere and adding to his sense of isolation.  As Mr. Nash explains it, he

> was experiencing what was undoubtedly the most challenging period in my professional working career. I was not coping well with the associated stresses of the seemingly unending demands and pressure placed upon me, and my health started to deteriorate as a direct consequence. I was frequently experiencing bouts of insomnia that further reduced my ability to contend with the rigors of my job. To make matters worse I would often find myself called upon in the middle of the night to respond to emergency situations at work . . . My situation really started to deteriorate when my line manager, the Centre Director with whom I had worked very closely [Dr. Mason], suddenly left the service following a change in the political landscape. He was replaced by someone who I found to be very problematic, and my work life became a misery to the extent that I would often find myself feeling physically sick as I

6

approached the final part of my journey into work.  My cocaine use spiraled out of control as I sank ever deeper into addiction, and what was once infrequent recreational use became ever more frequent.

Exhibit C.

Dr. Mason writes of how Mr. Nash turned to drugs as a way to cope with the difficulties and rigors of his professional life.  Exhibit A (Mason).  Mr. Nash also began drinking heavily to alleviate stress at work.  Exhibit A (Oxnam, Ryan).  Mr. Nash writes that he "started to self-medicate with various illicit substances, namely cocaine and MDMA as yet further maladaptive coping strategies.  My consumption of alcohol also increased, becoming my established routine for relaxation every night[.]"  Exhibit C.  According to Mr. Nash's fiancee, he withdrew socially, and suffered from depression, fatigue and loneliness.  He started abusing cocaine in order to cope, and however misguided or errant his purpose, found a bond with similar Silk Road users who used drugs as an escape.  Exhibit A (Ryan).  His fiancee writes:

> I can imagine Peter, in need of drugs, finding this online forum and fuelling his addiction.  I can imagine that he believed that others on the forum were as himself; highly educated professionals seeking drugs for personal use.  I can well imagine he rationalized the forum as a way to help others get what they needed in their lives . . . I suspect that he took a job as moderator of the chat room to fund his drug use.

Exhibit A (Ryan).

Again, Mr. Nash tells it best:

> The Internet chat forums of Silk Road became an escape for me, and I found myself spending ever-increasing periods online in cyberspace where my real life stressors seemed left behind, albeit temporarily.  As a moderator on a chat forum, I enjoyed some status within the online community, and this filled a void in my life, a void that should have been filled by other pursuits such as my relationships and real world job.

Exhibit C.

7

Eileen Ormsby, an Australian journalist who came to know Mr. Nash through their interaction on the chat forums, writes that Mr. Nash

> arrived at Silk Road as a purchaser of party drugs, such as MDMA and cocaine. He seemed to dive into the community quickly, enjoying the camaraderie the forums offered and becoming involved in discussions revolving around safety and community connections. I believe [Mr. Nash] became a forum moderator with good intentions, wanting to help people, but also because it gave him a sense of status among those whom he had come to consider his new friends. His job was to delete spam, help with questions, move posts around if they were put in the wrong forums or delete them if they put someone in danger (such as if a disgruntled member posted identifying details of somebody). Forum moderators also had to immediately remove particularly objectionable posts, such as anything linking to offensive pornography or sites selling other objectionable services, and had the power to ban or suspend the accounts of people who did so.

Exhibit D. Ms. Ormsby emphasizes further that the Silk Road "community discussion forums were a separate website hosted on a separate server. No sourcing or selling of drugs was permitted on the forums. They existed purely for discussion by Silk Road customers, vendors, and interested others (one did not need to have an account on the Silk Road marketplace in order to access the Silk Road forums)." Exhibit D. Mr. Nash further writes, with an unusual degree of candor and self-awareness, that he "was justifying my own drug use by normalizing it and deluding myself. I then took that deluded perception with me onto the forums seeking the company of what I perceived to be other like-minded individuals whose attitudes and beliefs were seemingly aligned to my own." Exhibit C.

Thus, rather than becoming involved in the drug trade for profit or greed, Mr. Nash began moderating the Silk Road chat forum to finance his growing drug problem that was created by and exacerbated by his admirable qualities in helping those who needed help the most.

8

Mr. Nash is hardly the sort of predatory large-scale drug trafficker that policy makers had in mind when formulating the severe penalties in whose cross-hairs he now finds himself.

Two qualities emerge universally in the video and the torrent of letters submitted to the Court on Mr. Nash's behalf: (1) admiration for how he has devoted his life to the often thankless job of helping the vulnerable and less fortunate; and (2) bewilderment that he became involved in a criminal endeavor, but secure in the knowledge that he intended no harm to anyone. These qualities define him far more than his offense of conviction. He is defined by his compassion, his willingness to help people, his empathy and care. Exhibit A (Gorman, Ryan). Mr. Nash possesses a "natural instinct in looking out for other people" and "has a heart of gold." Exhibit A (Shields, Darryl Fayers).

A few examples are illuminating. After a natural disaster, Mr. Nash volunteered his time in the recovery effort. Exhibit A (Brannigan). Multiple friends have written that Mr. Nash cared for and helped out by bringing over food after an injury or illness. Exhibit A (Brannigan, Shaw). When a neighbor was locked out, Mr. Nash drove her to the real estate office to retrieve a spare key, helped her with odd jobs in her apartment, and helped cheer her up during a difficult period. Exhibit A (Shaw). When a friend at a party made unwanted advances toward an inebriated woman, Mr. Nash confronted him and put a stop to it. Exhibit A (Ryan, Gordon). When a closeted gay friend came out to Mr. Nash, he helped ease the transition, comforted him, and assisted in his efforts in garnering acceptance and understanding from the friend's family. Exhibit A (Gordon). Mr. Nash's subordinates and colleagues write glowingly that he is a caring, valued and involved supervisor who has supported them immensely during

medical and family emergencies.  Exhibit A (Oxnam, Sidney, Wong).  He also spearheaded

mental health and disability reform.  Exhibit A (Brannigan)

   Another characteristic that comes across is his loyalty and devotion - an unusual

number of letters have been submitted from lifelong friends, who might otherwise have been

expected to have lost touch or contact with each other over the years and geographical distances.

Exhibit A (Franklin, Tucker).  Not so for Mr. Nash.  All of these people have stood behind and

supported Mr. Nash and stand ready to help him put this chapter of his life behind him.  Exhibit

A (Clarke).  In short, Mr. Nash is the sort of person we are lucky to know.  Mr. Nash's two

decades of helping those in need should not be washed away or overshadowed by his poor

decision to become involved, however attenuated his participation, in Silk Road.

   Mr. Nash's arrest in late 2013 came at a particularly inopportune time.  In the

weeks before his arrest, Mr. Nash had begun to appreciate the depths of his problems and sought

medical intervention to initiate the withdrawal process.  Thereafter, instead of flying to the

United Kingdom to visit his parents for Christmas, his first Christmas visit with his elderly

parents in years, Mr. Nash was taken into custody and has not seen his family since.  Exhibit C.

More, Mr. Nash was about to propose to his longtime girlfriend, Ms. Ryan.  By devotion and

strength of character, she has supported him, and they are now engaged and will marry after he is

released from custody.

   Mr. Nash has devoted himself to his recovery in prison.  In Brisbane, while

awaiting extradition, he assisted other inmates as "Bail Clerk" and "Unit Buddy," and has helped

inmates at the MCC with their high school equivalency tests.  Exhibits A (Ryan) & C.  While

detained at the MCC, he has thrown himself into virtually every conceivably available activity,

including drug abuse awareness classes, and has been awarded a slew of certificates of recognition, including the following: Four Perspective, Drug Abuse Education, Getting Out By Going In (Positive Decision Making and Self-Corrective Education), Non-Residential Drug Treatment, Drama, the Focus Forward Project, and African-American Drama. Exhibit E. Mr. Nash received the following note from a project coordinator or facilitator:

> Peter, congratulations on your speech today! You were always engaged and present in class, and I saw that in the way you delivered your reflections on the course here today. We were so impressed with your ability to have insight about your life, and how you always looked at the big picture, even when you faced frustrations and challenges. I was so inspired by how you viewed each part of your life as part of your larger journey. That each experience would eventually lead to positive growth. You encouraged your classmates to not get caught up in their daily struggles, but to use hardships as motivation for future accomplishments, You are curious about the world, and are eager to interact with people who are different from you, and to understanding of, and learn from those differences. I hope you maintain that motivation to make positive progress in your life. Congratulations!

Exhibit E.

C.    Mr. Nash's Conditions of Confinement Further Merit a Guidelines Variance

In fixing a proper sentence, the Court should consider that the circumstances of his confinement have and will continue to be more onerous than typical defendants. While awaiting extradition in Australia, Mr. Nash was gratuitously assaulted by prison guards, who randomly beat inmates like Mr. Nash apparently as a means of responding to other inmates who violated prison rules. The beating, in which Mr. Nash sustained moderate to severe injuries, including bruised ribs, black eyes and residual numbness in his arms, was the subject of a letter written by him to his Brisbane counsel, a letter written to Brisbane authorities and a Brisbane press report. Exhibit F.

11

Moreover, Mr. Nash is incarcerated in a foreign country where he knows no one, and where his family and friends have not been able to visit him, for reasons both financial and medical. Thus, he has been alone essentially for a year, coming on the heels of a difficult period of depression and loneliness that presaged his involvement in Silk Road. This isolation has aggravated the conditions of incarceration at the MCC, already a difficult place of imprisonment even under normal circumstances, as numerous judges have recognized. Even if Mr. Nash is not sentenced to time served and designated to another facility to serve the remainder of his sentence, his parents and fiancée will still be unable to visit because of the distance involved and, in the case of his elderly parents, because they are physically unable to make the journey.

Further, if the court determines that more incarceration is necessary, Mr. Nash's immigration status would alone likely prevent him from being designated to a low security facility or prison camp and make him ineligible for BOP programs, such as early release and drug abuse treatment, that might otherwise make his incarceration shorter, less onerous and more productive.

The cases provide an ample basis for a departure or variance on these grounds. See *United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures"); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1997); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (VM) (pre-trial abuse by prison guard warranted departure and "effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines"); *United States v. Mendola,* 03-CR-449 (S.D.N.Y. 2005) (KMW)

12

(reducing sentence by one-third of the time spent in the MCC because of poor and unsanitary conditions, overcrowding, inadequate bathroom facilities, inadequate medical attention and concluding that "under Section 3553, some lowering of what would otherwise be his sentence is appropriate"); *United States v. Francis*, 129 F. Supp. 2d 612, 619 (S.D.N.Y. 2001) (RPP) (departing downward based on defendant's thirteen and one-half month pretrial detention at facility where he suffered severe physical and psychological trauma including restricted family visits "under qualitatively different conditions than those of pre-sentence detainees in federal facilities"); *United States v. Behr*, 2006 U.S. Dist. LEXIS 38349, at *12-13 (S.D.N.Y. June 14, 2006) (RWS) (sentencing defendant to time served after pre-trial incarceration at MCC where conditions were overcrowded, unsanitary, and lacked certain facilities, and rose to level of punitive rather than administrative confinement); *United States v. Alvarez Castellanos*, 2006 U.S. Dist. LEXIS 76784, at * 9-12 (RWS), 2006 WL 3016313 (S.D.N.Y. Oct. 23, 2006) (discussing conditions abroad and beatings by guards endured by defendant); *United States v. Trochtchenkova*, 05 Cr. 503 (SAS) (Oct. 11, 2006) (departing where defendant had no family in the United States); *United States v. Salvador*, 2006 U.S. Dist. LEXIS 49543, at *14 (S.D.N.Y. July 19, 2006) (LMM) (departing because of unsatisfactory conditions in pre-trial incarceration).

Mr. Nash's treatment in Australian custody, combined with the aggravated isolation at the MCC, create an extraordinary punishment that the Guidelines did not contemplate or foresee. His pretrial incarceration has been qualitatively more severe than a typical or heartland pre-trial detainee. Even if it is not a basis for a formal departure under the Guidelines, his pretrial confinement warrants some degree of leniency in the court's 3553(a) calculus and counsels a sentence of time served.

13

D.    The Offense Conduct and Harm Reduction

Mr. Nash's offense conduct is further distinguished from the types of heartland drug conspiracies targeted by the Guidelines because it was geared towards reducing, not aggravating, the types of problems traditionally attendant to the drug trade, especially violence and territoriality associated with distribution, gangs and criminal syndicates.  Because of the nature of drug use and distribution, there are unlikely to be statistics or incontrovertible proof of how Silk Road lessened drug violence, but commentators have noted the likelihood of such results.

> This new breed of drug dealer [operating on Silk Road] is also likely to be relatively free from the violence typically associated with traditional drug markets.  Whereas violence was commonly used to gain market share, protect turfs and resolve conflicts, the virtual location and anonymity that the cryptomarket provides reduces or eliminates the need – or even the ability – to resort to violence."

*See* Judith Aldridge & David Decary-Hetu, "Not an 'E-Bay for Drugs': The Cryptomarket 'Silk Road' as a Paradigm Shifting Criminal Innovation," at 16 (May 13, 2014), available at ssrn.com.

While it is not our purpose to tout or justify Silk Road, its manner of operation or Mr. Nash's limited role, it was too different from the traditional drug conspiracy to lump it together with heartland drug conspiracies for purposes of sentencing.  For example, the site's interactive features, rating system and accountability minimized a vendor's ability to sell an adulterated or dangerous product that could lead to adverse health effects; users would be able to warn each other not to purchase from such vendors, and they would be driven from the marketplace.  One particular Silk Road forum focused on drug safety and harm reduction; users informed each other on practices to avoid and sources to either pursue or avoid.  Or an inexperienced drug user would be able to solicit advice and guidance from others to help ensure

14

that he or she did not overdose, did not mix one substance with another, or could seek answers

on how to seek treatment and eventually stop using. *See* Marie Claire Van Hout & Tim

Bingham, Silk Road, the Virtual Drug Marketplace: A Single Case Study of User Experiences,

INT'L JOURNAL OF DRUG POLICY (2013).[1]  Silk Road promoted education, awareness and

responsible usage.

> Ms. Ormsby, the Australian journalist, writes that she

>> was impressed by the Silk Road philosophy of not allowing anything to be sold 'the purpose of which was to harm or defraud others' (something that set it apart from the other markets, which sold stolen credit cards, personal information, poisons (etc). The site's staff had a commitment to harm reduction – one of the most popular forums was the one dedicated to safe drug use and treatment of addiction – and a desire that adults who chose to use drugs might do so in an environment of (market-driven) quality control and free from violence.

Exhibit D.  She writes further that "[o]ne of the largest and most popular threads [a "thread" is an

organized discussion on a chat forum] was started by Dr. Fernando Caudevilla, an expert in illicit

drugs, who provided health, safety and harm reduction advice to members of the site."  Exhibit

D.  Dr. Caudevilla was retained by the Silk Road principal in order to provide that service, and

Ms. Ormsby reports that he has provided answers to hundreds of questions about dosage,

tailored-harm reduction, effects, interaction with other drugs, toxicity, how to handle overdose

symptoms, and otherwise, and that his "thread" has been visited more than 64,000 times.  Exhibit

G.

> The government has indicated to Probation that it wishes to include information

on six deaths that occurred, purportedly as a result of taking drugs that may have been purchased

---

[1] Available at http://www.ijdp.org/article/S0955-3959%2813%2900006-6/fulltext.

off Silk Road.[2]  Aside from the fact that the government has not established causation with any

reasonable degree of confidence (such that the deaths are in fact attributable to Silk Road drugs

other than the fact that the victims had purchased drugs off Silk Road in the past), multiple

problems present themselves if the Court were to rely on these tragedies to impose a sentence

longer than it otherwise would have.  If Mr. Nash sold a product that was particularly unsafe or

toxic, it might be more fair to hold him accountable (even in a general sense under Section

3553(a)).  But Mr. Nash had no involvement in manufacturing or distributing *any* product, let

alone one whose dangerousness could lead to death as the ordinary and natural consequence of

ingestion, and he did not profit from any drug sales.  Consideration of these fatal overdoses

injects a level of arbitrariness that has no place in sentencing, and subverts traditional principles

of causation, accountability and criminal liability.  Mr. Nash has spent his life working towards

rehabilitation and treatment for the most vulnerable; it is simply inconceivable that he would

knowingly contribute, even indirectly, to the tragedies that the government brings to the Court's

attention.

    E.    <u>The Inadequate Effect of Role and Motivations</u>

        Even if the conspiracy in the aggregate dealt in large quantities, Mr. Nash

personally did not.  Beyond the nature of Mr. Nash's limited participation and remuneration, the

Court's obligation to consider his history and characteristics requires some recognition of how

and why he became involved in the Silk Road.  Judges have recognized that such considerations

---

[2] Mr. Nash believes that the issue of the six fatalities will be litigated more comprehensively in the upcoming sentencing of Ross Ulbricht, the purported principal of Silk Road, who was recently convicted after trial before the Honorable Katherine B. Forest (S.D.N.Y. Case No. 14-cr-68).  Mr. Nash joins in full and incorporates herein the salient arguments in Mr. Ulbricht's sentencing submissions to the extent relevant to him.

have a direct bearing on culpability and punishment. *See United States v. Amaya*, 2013 U.S. Dist. LEXIS 82274, at *56 (N.D. Ia. June 11, 2013) (distinguishing defendant whose "own drug use was the conduit that led to his involvement in the drug trade" with trafficking not merely to feed an addiction but from "greed or at least a preference for making "easy money dealing drugs rather than by working hard"). Mr. Nash falls into the first categorically, and ironically, his hard work in his legitimate employment was what drove him to abuse drugs and become involved in the Silk Road in the first instance as an escape from the isolation and stresses of his emotionally-challenging job. *See United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (sentencing to substantial variance to address defendant's abuse of alcohol, which "obviously made him vulnerable"); *United States v. Hubel*, 625 F. Supp. 2d 845 (D. Neb. 2008) (affording substantial consideration to low-level defendant's involvement in larger distribution conspiracy to feed her own drug habit); *United States v. Woody*, 2010 U.S. Dist. LEXIS 72909, at *27 (D. Neb. July 20, 2010) (sentencing defendant to minimum term of imprisonment and noting that the conviction was a "reflection of her drug dependence"); *United States v. Dossie*, 851 F. Supp. 2d 478, 481-83 (E.D.N.Y. 2012) (sentencing defendant to minimum after noting that guideline range was too severe for a low-level addict who was "in the drug business because he is a drug user").

Judges have faulted the Guidelines for the fact that the limited adjustments for role are insufficient to counter-balance or offset the skewing effect of quantity. For example, Judge Gleeson noted that there were 32 levels of differentiation as to quantity (ranging from offense levels 6 to 38), but only 8 as to role (four of which were aggravating enhancements anyway, in the other direction). *See United States v. Diaz*, 2013 U.S. Dist. LEXIS 11386, at *77-79 (E.D.N.Y. Jan. 28, 2013); *Cabrera*, 567 F. Supp. 2d at 273 ("While deductions for a

17

defendant's minor role are available under the Guidelines, they are limited and do not come close to offsetting the high quantity-driven base offense level"); *United States v. Thomas*, 595 F. Supp. 2d 949, 952 (E.D. Wisc. 2009) (noting that minor role adjustment "did little to take account of defendant's lesser role in the crime").  Here, even accounting for the mitigating role cap in 2D1.1, as well as the additional two level reduction because of Mr. Nash's safety-valve eligibility (which does not even require a mitigating role, but only the absence of an aggravating one), that adjustment only comes to seven offense levels, which does little to offset the base offense level of 36 created by considering quantity alone.  Where a minor role reduction inadequately reflects the defendant's peripheral involvement in the offense, a further departure or variance may be warranted.  *See United States v. Koczuk*, 166 F. Supp. 2d 757 (E.D.N.Y. 2001); *Thomas*, 595 F. Supp. 2d at 952; *United States v. Jaber*, 362 F. Supp. 2d 365, 382 (D. Mass. 2005) (minor role adjustment "did not begin to reflect defendant's position in the enterprise").  In practice, these sorts of accommodations and adjustments are insufficient; they tinker around the margins of a structurally flawed enterprise.

F.    The Guidelines' Focus on Quantity Fails to Reflect Culpability

The Sentencing Guidelines, with their relentless focus on numbers and attempts at measuring the immeasurable, take none of Mr. Nash's circumstances into account.  The numbers, offense levels and guideline ranges create the illusion of precision where there is none.  If only for that reason, the Guideline range here would be severely flawed.  But their flaws are structural as well, for this case is another where the Guidelines' overemphasis on quantity at the expense of a defendant's role – *even if Mr. Nash were not the selfless, devoted person he is* – would

18

produce a term of imprisonment far longer than necessary, without any legitimate penological purpose.

Even though Mr. Nash, as the government and PSR recognize, satisfies the conditions for "safety-valve" relief under 3553(f) and is not subject to the ten-year mandatory minimum, all that "win" nets him is exposure to a sentencing guideline range that, if not draconian, is at least on the facts of this case, greatly excessive. Judge Gleeson described this conundrum as getting out of the mandatory minimum frying pan only to get into the Guidelines fire. *See Diaz*, 2013 U.S. Dist. LEXIS 11386, at *2. In that lengthy opinion from 2013, Judge Gleeson systematically exposed not only how quantity became the Commission's primary determinant of the length of a sentence, but more important, how flawed and arbitrary drug weight is as a measure of the defendant's relative culpability.

The Commission set the drug guideline ranges against the backdrop of the 1986 Anti-Drug Abuse Act ("ADAA"), whose penalty provisions were driven exclusively by weight and drug-type. *See United States v. Hayes*, 2013 U.S. Dist. LEXIS 80240, at * 15-36 (N.D. Ia. June 7, 2013); *Diaz*, 2013 U.S. Dist. LEXIS 11386, at *20-22, 28-29. The mandatory minimum terms in the ADAA were originally intended for "serious" traffickers (mid-level managers) and "major" traffickers (kingpins, organizers and leaders). *See Diaz*, 19-22; 30-32; *Hubel*, 625 F. Supp. 2d at 849-51. Quantity was seen not only as a measure of culpability, but as a proxy for role: the more "serious" and "major" drug traffickers would generally be accountable for dealing in far greater quantities than their low-level or street-level counterparts. *See Dossie*, 851 F. Supp. 2d at 480-81 (citing legislative history). Among others, one flaw in this reasoning is that it fails entirely to account for the nature of a drug conspiracy, whose members will typically have wildly

19

disparate levels of culpability. A drug *conspiracy*, however, was not originally included among

those offenses subjecting the defendant to a mandatory minimum, which were instead limited to

substantive distribution, importation and exportation. But in 1988, Congress passed additional

legislation to ensure that the mandatory minimum terms in the ADAA applied to a conspiracy to

commit those offenses as well. *See Hubel*, 625 F. Supp. 2d at 850.

> The Sentencing Commission, meanwhile, rather than relying on the data and past

sentencing practices it had collected on drug cases, chose instead to anchor all drug guideline

ranges to the quantities for the mandatory minimum terms established in the ADAA. *See*

*Kimbrough v. United States*, 552 U.S. 85, 95 (2007); *Hubel*, 625 F. Supp. 2d at 849-51; *Diaz*,

2013 U.S. Dist. LEXIS 11386, at *28-30. For example, the offense level for dealing in a

threshold quantity of heroin, one kilogram, was set to correspond roughly to the ten-year

minimum that Congress established in the ADAA for trafficking in one kilogram of heroin.

Thus, weight became the sole proxy to assess culpability for all drug defendants, even though the

ADAA established mandatory minimums only to target kingpins and mid-level managers, or the

leaders and managers of drug organizations. *See Hayes*, 2013 U.S. Dist. LEXIS 80240, at * 31,

57; *Diaz*, 2013 U.S. Dist. LEXIS, at *28-29; *Woody*, 2010 U.S. Dist. LEXIS 72909, at *13-15.

All things being equal, a defendant who traffics in five kilograms of cocaine is more culpable

than one trafficking in half a kilogram. But three decades of mandatory minimums and

Sentencing Guidelines have taught us that "all things" are rarely equal in drug conspiracies. *See*

*Hubel*, 625 F. Supp. 2d at 853 ("The Guidelines' quantity-driven, 'market-oriented' approach is

not a proxy for culpability in every case, nor does it always correlate to the purposes of

sentencing in Section 3553(a). Drug quantity is only an accurate measure when it corresponds to

20

a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where

the defendant falls in this hierarchy is an important factor in the court's assessment of a

defendant's ultimate culpability.").

In *Diaz*, Judge Gleeson discussed the folly of the policy choices instituted by

Congress and the Sentencing Commission, and how the current approach is divorced from more

proper sentencing considerations, producing outcomes out of all proportion with the relative

wrongfulness of a given defendant's conduct. 2013 U.S. Dist. LEXIS 11386, at *68-80. He

focused on low-level participants like Mr. Nash: paid a small amount and caught up in a much

larger conspiracy involving an amount of drugs in which they have no proprietary interest, and

driven to the offense by their own drug abuse.

If Judge Gleeson were an outlier, his concerns might be more easily dismissed,

but he is hardly alone in his frustration with the injustices that result when weight is used as a

proxy for culpability. An increasing number of judges have expressed similar frustrations when

sentencing similarly-situated defendants. *See Cabrera*, 567 F. Supp. 2d at 276-77("the

Sentencing Commission has never explained how drug quantity is meant to measure offense

seriousness, and significantly, how it correlates with the purposes of sentencing"); *Hayes*, 2013

U.S. Dist. LEXIS 80240, at * 52 ("Quantity is a particularly poor proxy for defendants who

played a minor role in the drug trade"); *United States v. Nincehelser*, 2009 U.S. Dist. LEXIS

26219, at *19 (D. Neb. Mar. 30, 2009) (quantity is "not always a trustworthy measure of the

culpability of an individual defendant"); *Thomas*, 595 F. Supp. 2d at 952 n.1.

Former Judge Martin, whose frustration with the drug sentencing laws helped

drive him from the Bench, lamented that "these harsh penalties are applied without any thought

about the level of involvement of the particular defendant in the narcotics distribution scheme."
John S. Martin, Jr., "Why Mandatory Minimums Make No Sense," 18 N.D. J. LAW, ETHICS &
PUB. POLICY 311, 317 (2004). Even the Commission itself acknowledged that drug quantity "has
been called a particularly poor proxy for the culpability of low-level offenders, who may have
contact with the significant amounts of drugs, but who do not share in the profits or decision-
making." *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal
Criminal Justice System is Achieving the Goals of Sentencing Reform* 50 (November 2004),
available on www.ussc.gov; *see also Woody*, 20010 U.S. Dist. LEXIS 72909, at *25-26 ("[The
defendant's] role was minor and it is clear she was generally motivated by the need to feed her
addiction, rather than to profit from the enterprise . . . In view of her attenuated role in the
conspiracy, the quantity attributable to the overall conspiracy is not a reliable proxy for Woody's
culpability").

If these kinds of observations are true in a mine-run drug conspiracy, they apply
with even more force to Mr. Nash, whose remove from the actual distribution both
geographically and by the nature of his participation, renders the weight attributable to the overall
conspiracy a particularly exaggerated proxy by which to measure the wrongfulness of his
conduct. Mr. Nash's role as moderator of a Silk Road "chat forum" was limited, as he explained
when he pled guilty:

> As moderator of the chat forum, I was mostly responsible for keeping an eye out for
> scams, deleting anything related to child pornography, answering questions, and
> deleting spam. For me, it was mostly a place to socialize [and to buy illegal drugs.
> The money] I was paid .. . I used for more drugs, for my own consumption.

22

Transcript of Plea Hearing, at 9.  Apart from the drugs Mr. Nash bought for his own use and a small universe to share with other addicts in Australia, he was not involved in any distribution, transactions or negotiations, was not formally or informally a part of any drug trafficking organization, and was not a stakeholder in the actual distribution.  Ms. Ormsby, the Australian journalist, writes that Mr. Nash "only ever had a role in the discussion forums.  He had no control over anything that happened in the markets.  He had no influence in what the marketplace did. He never sold drugs himself.  He had no say in what drugs could be sold, to whom or by whom." Exhibit D.  Rather than joining in the objects of a conspiracy to distribute, Mr. Nash at most agreed to help support distribution by others, whose agendas were not his own.  *See United States v. Sanchez*, 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996) (noting that among the many roles in a drug conspiracy, the "least culpable is the facilitator . . . [whose] role is to bring together the buyer and the seller").

As for money laundering, it would have been impossible for Silk Road to function anonymously if users could not exchange payment in Bitcoins.  But Mr. Nash only laundered the Bitcoins involved in his own transactions.  Holding him accountable with the international laundering of all the proceeds of Silk Road is the same empty tautological exercise as holding him accountable for all of the website's international drug transactions: any surface appeal is dwarfed by reality.

Mr. Nash's conduct is so far from the heartland conduct of a typical drug conspirator and money launderer that it makes little penological sense to apply a penalty scheme that was intended for such different conduct.  To the extent the "heartland" concept even applies to drug cases – *see Diaz*, 2013 U.S. Dist. LEXIS 11386, at *9 ("The [drug] Guidelines ranges

are not now, and have never been, the heartlands the Commission sought to establish"); *Hayes*, 2013 U.S. Dist. LEXIS 80240, at *58 ("The Guidelines range for methamphetamine offenses do not constitute the typical case or heartland") (citing *Diaz*) – Mr. Nash's presence on the Silk Road chat forum is well outside it.

G.     Relevant Conduct in Context

        At the plea hearing, Mr. Nash's allocution did not refer to a specific amount of narcotics as the object of the conspiracy. Because he entered a guilty plea to Section 841(b)(1)(A), the government's view was that the threshold quantities in that statute needed to be expressed before the court could find a sufficient basis for the plea. Mr. Nash was thus questioned about quantity, and he admitted to understanding that the Silk Road website dealt in quantities of cocaine greater than five kilograms, heroin greater than one kilogram, LSD greater than 10 grams, and methamphetamine greater than 500 grams. Transcript of Plea Hearing at 12-14. Thus, Mr. Nash's plea to a (b)(1)(A) offense may disable him from advocating for an offense level based on drug quantities inferior to the threshold amounts in Section 841(b)(1)(A). But the Guidelines' concept of relevant conduct, according to which the great majority of drugs sold over Silk Road become attributable to Mr. Nash as reasonably foreseeable (no matter how tenuous his connection with the actual distribution and transactions save for his personal use or peripheral his involvement), should not render irrelevant an alternative calculation based on a quantity of narcotics in which Mr. Nash *was* personally involved, particularly given his lack of control over the quantities distributed in the broader conspiracy. *See, e.g., Nincehelser*, 2009 U.S. Dist. LEXIS 26219, at *17 ("In view of [the defendant's] attenuated role in the conspiracy, this is one of the cases in which the quantity determination does not serve as a reliable proxy for

culpability"); *United States v. Chalarca*, 95 F.3d 239 (2d Cir. 1996) (departing pre-*Booker* where

no particular quantity of drugs was reasonably foreseeable to defendant); *United States v.*

*Mendoza,* 121 F.3d 510 (9th Cir. 1997).

   In formulating the drug Guideline ranges in the 1980s, the Sentencing

Commission could never have imagined the ease with which use of a personal computer in one's

own home could ratchet up a defendant's sentencing range under the Guidelines and expose a

defendant far removed from the actual channels of distribution to the sorts of penalties that

Congress and the Commission intended only for kingpins, managers and street-level traffickers.

Even if the Commission contemplated that a computer or the Internet would be used to further

the objects of a drug conspiracy, it did not anticipate that an underground website *would* be the

drug conspiracy, and that a defendant's participation in a drug conspiracy could be limited to the

activities that Mr. Nash engaged in while moderating a chat forum. *See, e.g.*, Mandatory

Minimum Penalties in the Federal Criminal Justice System 166-67 (U.S.S.C. 2011) (establishing

hierarchy of culpability in drug conspiracies based on typical roles including suppliers,

organizers, manufacturers, wholesalers, managers, street-level dealers, brokers, couriers and

mules); *see also Hayes*, 2013 U.S. Dist. LEXIS 80420, at *55-57.

   The Guidelines themselves recognize that the criminal activity a defendant jointly

undertakes with others is not necessarily coextensive with the larger scope of the entire

conspiracy. *See* U.S.S.G. §1B1.3 cmt. n. 2; *see also Hernandez-Santiago*, 92 F.3d at 100

(distinguishing, for relevant conduct purposes, between quantity defendant agreed to distribute

and the "entire amount of cocaine sold by the gang during the time he participated in the

activities of the organization"). Thus, Mr. Nash's admission during his plea hearing that the

25

*website* dealt in the specified quantities establishes neither that those were quantities he agreed to distribute, nor that they should serve as a basis or a floor for his relevant conduct calculation. The Guidelines further recognize that the relevant conduct of a defendant who "performs a limited function in concerted criminal activity" may sometimes exclude the quantities distributed by the larger conspiracy, and be limited instead to amounts "in which the defendant personally was involved." U.S.S.G. §3B1.2 cmt. n. 3.  In such cases, where the base offense level reflects the defendant's own conduct and not the broader conspiracy, there may be a lesser basis for a mitigating role adjustment, but there is little dispute that such a calculation better approximates a defendant's culpability. *See United States v. Roberts*, 223 F.3d 377, 381 (6th Cir. 2000); *United States v. Lucht*, 18 F.3d 541, 555-56 (8th Cir. 1994).

An alternative framework that reflects the approximately 200 grams of cocaine and 25 grams of MDMA in which Mr. Nash was personally involved would produce an offense level of 18, or between 40 and 60 kilograms of marijuana, adopting the Guidelines' equivalency ratio under which one gram of cocaine and MDMA is treated as the equivalent of 200 and 500 grams of marijuana respectively.  Even if he would not be entitled to a mitigating role adjustment and the minor role cap in Chapter 2D1.1 – on the theory that he did not play a minor role with respect to that limited subset of transactions of the larger conspiracy – the adjusted offense level (18) would still be thirteen less (a base offense level of 36 reduced by five levels for a minor role adjustment and minor role cap) than it would be if the relevant conduct sweeps in the broader universe of distribution that the Silk Road facilitated.[3]  Thus, the Court should either use the

---

[3] The government's calculation in the PSR of roughly 60,000 kilograms of marijuana (based on the Guidelines "equivalency ratio" in which cocaine, heroin and methamphetamine are converted into their marijuana "equivalent") is also flawed because it appears to include amounts

amount of drugs with which Mr. Nash was personally involved rather than the entire quantity

bought and sold over the Silk Road website as the base offense level, or should recognize how

severely the drug quantity overstates Mr. Nash's limited and peripheral participation in the

offense.

    H.    <u>Extraterritorial Conduct</u>

        The government's calculation of quantity includes drugs that were not distributed

in the United States, and were not imported into it or exported from it.  Cocaine that went from

South America to Australia, for example, lacks any connection with the United States, and Mr.

Nash certainly did not distribute any drugs here.  In such circumstances, the Court should be

cautious about giving effect to relevant conduct that in many ways is *irrelevant*.  For just as

courts have warned about relevant conduct becoming the tail that wags the dog of the substantive

---

distributed prior to the point in time – January 2013 – when Mr. Nash entered into the conspiracy.  Ordinarily, relevant conduct "does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level)."  U.S.S.G. §1B1.2 cmt. app. n. 2; *see also Cook v. United States*, 2006 U.S. Dist. LEXIS 83425, at *6-13 (S.D.N.Y. Nov. 15, 2006).  Accordingly, the relevant quantity should be calculated only by reference to the cocaine, heroin and methamphetamine distributed after Mr. Nash joined the conspiracy in January 2013, until Silk Road was shut down later that year.

    Further, the government's apparent methodology in determining quantity – using the number of transactions involving cocaine, heroin and methamphetamine assuming that each was for a specified quantity – is flawed and unreliable, even assuming a reasonable basis for the Guidelines' marijuana equivalency ratios.  It may be that the government's methodology is immaterial to the base offense level (because of the breadth of the relevant range, between 30,000 and 90,000 kilograms) or even is favorable to Mr. Nash, but in a system that relies on coming up with a number with a reasonable degree of confidence, the Court should not place much stock in an inherently unreliable yardstick.

offense, the Court should not permit the quantities involved in the larger conspiracy to wag the dog of Mr. Nash's limited conduct in Australia.

That some of the Silk Road's vendors did business in the Southern District of New York in particular and in the United States in general may have allowed the government to prosecute Mr. Nash in this country and judicial district for conduct that occurred in Australia. But the transnational reach of cyberspace can produce sentencing outcomes in a jurisdiction that has almost nothing to do with the underlying conduct. Put differently, it would be incongruous to punish Mr. Nash – who never even came to the United States in connection with the offense, prior to his extradition – so severely for conduct that had so little to do with, and was not aimed at the United States.

The Second Circuit has said that the Guidelines' concept of relevant conduct can have extra-territorial reach. *See United States v. Greer*, 285 F.3d 158, 179-81 (2d Cir. 2000) (concluding that "foreign drugs" intended for distribution elsewhere are nevertheless included in relevant conduct calculation); *but see United States v. Azeem*, 946 F.2d 13, 16 (2d Cir. 1991) (noting that drug crimes abroad not committed against the United States do *not* constitute relevant conduct). That principle, however, does not require that the sentencing court merely ignore how removed Mr. Nash's conduct was from core federal concerns that justify the punishment of drug crimes in the first instance. The United States does not have general jurisdiction over drug crimes worldwide to prosecute acts that take place abroad and are not intended to reach the United States. The nexus with the United States may be sufficient such that prosecuting Mr. Nash here is not wholly arbitrary (the guilty plea waives the argument in any

28

event), but the Court should take into account how removed Mr. Nash's conduct was from more prototypical cases that punish conduct that occurred in or was aimed at the United States.

We spend enough money and resources incarcerating our own citizens for crimes committed here, or others whose conduct was directly aimed at the United States, without the need to incarcerate foreign nationals for conduct abroad that has limited connection to this country. If Australia wishes to further prosecute Mr. Nash to vindicate national interests or punish territorial conduct, it may do so, but the United States should not purport to stand in its shoes, and certainly should not impose a term of incarceration as if it does.

I.      Other Guidelines Adjustments

The PSR includes two additional Guidelines' enhancements: one because Silk Road vendors and users distributed narcotics through mass-marketing by means of an interactive computer service (Chapter 2D1.1(b)(7), which was included in the government's *Pimentel* letter), and one because the offense purportedly involved "sophisticated" money laundering (Chapter 2S1.1(b)(3), which the government did not include in its *Pimentel* letter). Applying either of these enhancements, and especially both, misapprehends the nature of the Silk Road website and Mr. Nash's conduct.

Silk Road did not operate as a way for narcotics distributors to *market* their products to other drug traffickers or to end users. The government and the Probation Department conflate marketing or advertising with sales, but they are plainly not one and the same. The Guideline commentary defines "mass-marketing by means of an interactive computer service" to mean the *solicitation*, by means of an interactive computer service, of a large number of persons to *induce* those persons to purchase a controlled substance. For example, [it] would apply to a

29

—

defendant who operated a website to *promote* the sale[.]" U.S.S.G. §2D1.1, cmt. app. n. 13 (emphasis added). The Commission's inclusion of such language indicates its desire to reach advertising rather than selling. In the world of legal commerce, a company will have a sales force dealing with customers and a marketing department to induce new customers, but they are generally not the same people. The government's description of Silk Road as an online marketplace or a virtual bazaar makes it apparent that the website was akin to a physical store, not the commercial or print advertisements that induce consumers to visit the store.[4] More, because of security protocols and encryption, members of the general public were not able to access the website. *Cf. United States v. Hanny*, 509 F.3d 916, 920 (8th Cir. 2007) (trial court did not err in applying the enhancement for illegal online pharmacy "freely accessible to all members of the public" and "reachable by an ordinary web search engine" and thus akin to an highway "billboard," but cautioning "mere use of a website is not sufficient to trigger this enhancement"); *United States v. Pirello*, 255 F.3d 728, 730-31 (9th Cir. 2001) (mass-marketing enhancement applied to fraud defendant whose internet classified ad offering goods for sale that he did not own permitted him "to solicit funds instantaneously and continuously from over 200 million individuals worldwide").

        As to the PSR's conclusion that the money laundering was sophisticated, it is incorrect. The Commission defined the term to include "complex or intricate offense conduct" that typically involves the use of fictitious entities, shell corporations, layering of transactions or offshore financial accounts. U.S.S.G. §2S1.1 cmt. app. n. 5. Cases involving sophisticated

---

[4] A similar enhancement in the fraud guidelines in Chapter 2B1.1 cmt. app. n. 4, defines "mass-marketing" as a "plan, program, promotion or campaign that is conducted through solicitation by [the Internet] to induce a large number of persons to purchase goods or services."

laundering have tended to follow suit. *See, e.g.*, *United States v. Clark*, 2012 U.S. Dist. LEXIS 175378, at *5-27 (S.D.N.Y. Dec. 11, 2012) (detailing scheme to transfer funds out of the country to support illegal poker operations involving websites as false fronts involving fraudulent invoices and transactions and fictitious loans to conceal existence of gambling websites); *Abreu v. United States*, 2010 U.S. Dist. LEXIS 601984, at *9-15 (S.D.N.Y. June 15, 2010) (outlining defendants' plot in establishing shell companies and using false invoices to conceal embezzled funds). Silk Road's use of Bitcoins as a payment system is not like these examples and is not complex or intricate enough merely because it uses a system that seems new or unfamiliar, but was in reality fairly simple. Further, where the conduct approached sophisticated levels, it was in relation to and facilitated the underlying drug transaction itself and not the money laundering offense conduct, nor downstream financial transactions.

The PSR suggests that the enhancement is warranted because the offense "involved an extensive online marketplace forum to facilitate the purchases of drugs and fraudulent documents through a special network which was designed to conceal the true Internet protocol and identities of the network's operators and users." But that description was the lifeblood of the underlying drug conspiracy; the ability to engage in drug transactions online and anonymously was only possible because of the infrastructure of the website and how transfers of money were ordered. Under the unique circumstances of this conspiracy, Mr. Nash's conduct was no more egregious because the money laundering was "sophisticated." Put differently, even if the money laundering was sophisticated, that feature of the offense conduct is all but included in Mr. Nash's base offense level for the drug quantity, which would never have otherwise been so elevated. To punish him more severely because of it is both unnecessary and unwarranted.

31

<u>Conclusion</u>

Before his arrest, Mr. Nash devoted his professional life to improving the lives of intellectually-challenged adults.  The difficulties inherent in that work led him to the social connection and accessible drugs of Silk Road.  He began addressing his problem even before his arrest, and his conduct since then has been exemplary: consenting to extradition, truthfully proffering all he knows about Silk Road to the government, helping fellow inmates in Brisbane and the MCC, and availing himself of virtually every available prison program.  Mr. Nash respectfully requests that the Court permit him to go home.

May 12, 2015

Respectfully submitted,

Andrew J. Frisch
Jeremy B. Sporn
The Law Offices of Andrew J. Frisch
40 Fulton Street, 23rd Floor
New York, New York 10038
212-285-8000
Fax: 646-304-0352

32