November 10, 2014

Dear Judge Griesa,

My name is Robert James Allen, most of my friends call me Rob. I'm 38 years old and am a senior HR Analyst for a publishing company in New York. I'm an Australian by birth but my father was American so I share citizenship with both countries. I'm writing to you today to share just a little bit about my dear friend Peter Nash, Pete. I hope my few words will give you an insight into the type of person he is.

I've known Peter Nash for more than 7 years and I consider him one of my closest friends. I can still remember the day we met over a few beers with a bunch of mates and I could tell immediately that we were going to be close. I don't know if it was his laugh or his overall demeanor, but in any case I just knew we were going to be good friends. It takes a certain type of person to have that effect on me, I guess you could say I'm wary of who I trust. Pete struck me as the type that frequently put others before himself and was always willing to lend an ear and listen to you when you needed a friend, and he demonstrated this on countless occasion's. One of the things I miss was our weekly curry night, Pete would cook a curry and we'd get together to talk about whatever was on our minds, the curry wasn't always great but the company was the reason I went there. This type of friendship is rare these days and having someone like Pete around is what life is all about.

I moved to the US back in 2009 following a woman that I had fallen in love with, and I can remember Pete played no small part in helping me make that decision. For me it was a massive decision to give up my job in Australia and move so far away from friends and family but having a friend like Pete who could help you put it all in perspective made it possible. I could tell that he really did have my best interests at heart and truly wanted me to do what was best for me. Although I'm back in Australia now, the decision to move to the US was one of the best things I have ever done both career wise and personally. Without people like Pete in my life these things would have been so much harder.

I miss Pete a lot, there are few people in my life that I would consider such good friends and having him so far away is taking its toll on me as I'm sure it is to his other friends and family, and of course for Pete.

I look forward to seeing Pete back in Australia very soon I hope. No matter what the outcome, he's life is going to be very different from before. I know he dedicated his life to helping others less fortunate than himself before all this happened and I'm sure he'll find a way to do that again if he can.

I hope this short letter gives you a better understanding of who Pete really is, and what he means to the people that love him. I'm sure I speak for everyone that knows him, please send him back to us as soon as you can, we all miss him dearly and just want him back in our lives again.

Yours Sincerely,

Robert James Allen

Dear Judge Griesa,

My name is Evin Austin Brannigan, and I am writing to you about my friend and confidant Peter Philip Nash.

I first met Peter approximately 7 years ago here in Sydney through a mutual best friend. Our friendship is one of those few friendships in life that sparked immediately. I found an early morning running partner, someone who enjoyed the easy health and lifestyle of living in Australia. We also share a love for the study of human behavior. For just over 20years I have worked as a hairdresser, and from my intimate dealings and relationships I've shared with my clients, I find human behavior fascinating. So when I found out that Peter worked as a Senior Manager / Senior Practitioner with people from often troubled and sometimes horrendous backgrounds who needed rehabilitation, it was a whole new world of education. We have spent countless hours talking about real life situations, dissecting, synopsis, possible outcomes etc.

Peter was also instrumental in the implementation of ground breaking legislation in the disability services field in Australia. In his last post he had a lead role in the commissioning of one of Australia's first Forensic Disability Services that focused on skills development and rehabilitation, as opposed to the traditional mental health and custodial models of support that did not meet the specific individual needs of people with intellectual disabilities.

When Queensland was hit with horrendous storms a few years ago, the city of Brisbane was declared a disaster zone. Peter took time off from work to became a volunteer, and along with hundreds of others helped clean up city streets and neighborhoods.

When I badly tore ligaments in my ankle several years ago, Peter was the first person to come over to my apartment to drop off food for me. Every evening after work for a week he came over with take away for me knowing I couldn't get it myself.

It saddens me as I write this as it feels like I'm writing a eulogy about my friend. The reason I mentioned the above examples are I truly wish to convey the person that Peter Philip Nash is. I am still not sure of the exact details of what he may or may not have done to end up incarcerated. What I do know however is that Peter is not the sort of person that needs to be kept incarcerated for the safety of the general public. Peter helps the general public. He has contributed to benefit not only people he has a vested interest in (family and friends), but those in need: those who society had given up on but works tirelessly on to rehabilitate, so they in turn can contribute to society.

I never thought I would be writing a letter, begging for my friend's freedom. I am aware he got involved with something that warranted his arrest, but whatever he did, however foolish a decision he made, I know he would never, ever have consciously hurt another human being. He had met a woman he plans to spend the rest of his life with, had a job in a country he truly loved, lived life to its fullest, and I know he regrets his actions beyond comprehension.

Your honor, I ask for your leniency. I ask that you allow a man who is remorseful for his actions, who still has a whole life ahead of him, the chance to start again, to continue being a great member of society, and no longer locked away.

Thank you for your time,

Evin Brannigan.

Anthony Clarke
25 Delafield Road
London
SE7 7NN

6 October 2014

To Judge Griesa

**Re. Peter Philip Nash**

I have written many references for Peter over the years, for a broad range of recipients. They were easy to write as he was a trusted and loyal friend who I saw regularly. Recent years have put continents between us, with me living in the UK and him in Australia. However, we spoke regularly, and visited when possible. We updated each other on our lives, our direction, our aspirations and the challenges we experienced.

The last 10 months have resulted in me truly reflecting on the character of the friend I met on my first day at school some thirty-five years ago. His actions have thrown not just his life, but his friend's and his family's into turmoil. I see first hand the stress and worry his elderly parents endure as they question if they will ever see their son again. When I speak with our friends, his actions dominate our conversation, yet still, we all stand firmly beside him and are there to support him.

Yes we feel anger, confusion and frustration. However, we recognise that the actions leading to his incarceration were misguided, ill judged and stupid to say the least. We support him as a trusted, reliable friend who's true character we judge by the years that we have know him and not by his recent actions. Although we recognise, and may not agree with some of his decisions in 2013, we see past this to the real Peter underneath.

For others to know Peter they should look to the last 20 years he has spent caring for and changing the lives of people less fortunate than himself, to understand his true moral compass. Peter is an individual that has immense value to offer society. His dedication to helping others less fortunate is a trait sadly lacking in many individuals.

I have questioned many things over the last 10 months, but not once have I questioned my friendship or my belief that Peter is a good person. Yes I agree he has made some poor decisions. However, I truly believe that his recognition of this and his agreement to be extradited are reflective of his honesty and his intention to ensure these misguided decisions are never again repeated.

As I write above, Peter has immense value and good to offer society, I truly hope you are able to see past recent events and see the individual his friends, family and work colleagues see beneath.

Yours sincerely,

Anthony Clarke

**Mr. Jamie Emberson**
**Bilting Court**
**Canterbury Road**
**Bilting**
**Ashford**
**Kent**
**United Kingdom**
**TN25 4HF**                                    <u>STRICTLY CONFIDENTIAL</u>
Date:          09/10/2014

**Reference:  Mr Peter Nash**

This is a reference for the above named.

**<u>Context</u>**
I am making this reference in the capacity of Mr. Nash's previous Tutor, Supervisor
and Mentor. I first met Mr. Nash in approximately 2002. At that time I was a
Registered Nurse, Registered Behaviour Nurse Therapist, Company Director of High
Quality Lifestyles Limited (Ltd.). I was also registered as a Principle Instructor for the
British Institute of Learning Disabilities (BILD).

In 2002 I received a referral from MCCH (a Charitable organisation based in the UK)
to agree a contract between us with regards to my input as a Consultant. This input
was specifically related to a young man that had the diagnoses of Intellectual
Disabilities, Autistic Spectrum Disorders and severe and challenging behaviours.
The goal of the 'Project' was to enable this young man to move from a secure and
institutionalised environment to a person centred service based within this young
man's local community.

Mr. Nash was employed by MCCH and held the post of Services & Practice Manager
for this project. He managed a team of approximately twenty people. My input to Mr.
Nash was to increase his knowledge and competencies in so far and related to
Positive Behaviour Supports and Non-Aversive Strategies.

Mr. Nash's attributes were highly impressive.
These included: -
- **His ability to have empathy**
- **His ability to communicate and relate to people**
- **His sincerity and integrity**
- **His reliability**
- **His concern for the well-being of others**
- **His willingness to learn and accept constructive criticism**
- **His ability to advise and look after others**

During the time that I have known Mr Nash the main attribute that impressed me was
his concern for people that were vulnerable and he on many occasions
demonstrated this concern by advocating for people's needs.

**Jamie Emberson**
**RN; RNBT.**

Darryl Fayers

56 Blackbutt Avenue, Pennant Hills

NSW 2120, Australia

Dear Judge Griesa,

My name is Darryl Fayers. I have known Peter for over 20 years. I grew up with Peter as we lived in the same area back in England and shared many interests and the same circle of friends. I would probably class Peter as my 'best' friend. He has been very loyal to me over the years and always been there if I needed anything.

When growing up in England in our circle of friends, Peter was always the person we would turn to if someone needed support or advice on anything. He has a heart of gold but is also very clear in his head and can always see things in an objective way. It always amazed me what Peter did for work and how he dedicated his life to helping other, less fortunate people. His patience and dedication in helping other human beings is amazing.

Peter was the best man at my wedding in 2007 and I honestly believe he was more nervous than me. He wanted everything to be perfect with regards to the organisation of the event and his speech etc. This is another demonstration of his selflessness and how much he cares about his friends.

I was absolutely shell shocked and amazed when I heard that Peter had been taken to jail at the end of last year. Out of everyone I know, he is the last person I would expect to get involved in anything illegal or something that would put him in trouble with the law. I don't know much in regards to detail about what he is supposed to have done or his involvement, I just hope that he comes out of the other side of this journey as soon as possible. I miss him and I know there are a lot of people in Australia and England who are praying for his safe return soon.

In summary, I trust Peter implicitly. He has been a fantastic friend to me over the years and I am devastated that he is where he is when he has so many great talents to offer the rest of the world. I heard that within a short period of being in jail in Brisbane Peter was helping other in-mates with their bail applications. This is Peter all over, he will always go the extra mile to do what he can to help people around him.

Yours sincerely

Darryl Fayers

Debbie Fayers

56 Blackbutt Avenue, Pennant Hills

NSW 2120, Australia

Dear Judge Griesa,

My name is Debbie Fayers and I know Peter Nash through my husband Darryl Fayers.  Peter Nash was best man at our wedding. I have known Peter for around 15 years.

Peter Nash is my husband's oldest and dearest friend. They have known each other since they were 17.  I became good friends with Peter when he came to Australia 6-7 years ago.  We also worked together for a period of time in Sydney.

I remember when Peter told me what he did for his living and I instantly liked him. Someone that wants to help people with behavioral issues is a good person in my eyes.  Some of the scenarios he told us about would have been very difficult but he seemed to love his job and was very good at it.

Peter is a kind person with a big heart and is always there for his friends.  My husband chose him to be best man at his wedding as he is such a solid friend and has never let my husband down.  My husband adores him and as I got to know him I could see why.

We worked together for a training company in Sydney both in Sales roles.  It can be quite a cut throat industry and competitive amongst peers but I never felt like that with Peter.  Peter would support and help me whenever I needed it and was a real team player.  We would bounce ideas off each other to try and help us both.  We had lots of fun at work functions and I really enjoyed working alongside Peter.   Peter would always have time to help me even when he was so busy himself.

Peter has a big heart and is a really great friend to my husband and me.  If we ever needed him for anything I know he would be there. Peter travelled to Cyprus to attend our wedding when it was completely out of his way on his world trip to Australia but he did this as he loves my partner and put him before himself.

I trust Peter and know he is a good person. Peter and his partner stayed at our home in Australia while we were overseas and I was more than happy for that to happen with all my personal belongings. I didn't think twice about it. Peter even left flowers and gifts in our home as a thank-you.

Peter is a fun and generous person.  Peter would have us in his home and cook for us on many occasion and we had lots of fun together.

Peter is an all-round good guy and doesn't deserve to have this happen to him. I am heartbroken for him and really hope that we see him soon.  Peter is really loved and missed by my partner and me.

Peter is a very intelligent person and enjoys helping people as you can see in the employment he chose.  The world needs more people like him.

Yours sincerely

Debbie Fayers

Grant Finlayson
35 Colinton Mains Road
Edinburgh, EH13 9AP
October 14, 2014

Judge Griesa
United States District Court for the Southern District of New York

Dear Judge Griesa:

My name is Grant Finlayson. I live in Edinburgh, Scotland with my wife Maggie Mazoleka and our son Robert. I was born in Edinburgh and brought up by my parents Robert and Christine Finlayson in Penicuik, Midlothian. I left school with a pretty decent education and decided with the persuasion of my grandparents that I should work in an office, instead, of 'working the tools', like my dad.

I work in the IT department of CMS Cameron McKenna an international law firm. I've worked in the legal industry for the past 12 years starting out with CMS in 2001 when I did my work placement year at Univesity. When I finished my degree in 2003 I started work again with CMS and stayed in London for a further 2 years before moving home in 2005 to be close to my now wife Maggie. During my placement year Pete lived in Ramsgate but would visit London regularly as his then girlfriend Caroline lived there and we would meet up on the weekends. During my second stint in London I met up again with Pete and would go out on a social basis in London most weekends as we stayed fairly close to each other in what is a huge city. Pete worked hard in health care looking after people with mental health issues which is an admirable thing and something I couldn't ever do.

When I finally came back home to Scotland in 2005, I still kept in touch with Pete and he and Caroline came up to Edinburgh for Hogmanay and I joined them both for a skiing holiday in Aspen. I knew they were both planning to head to Australia and although I felt sad that I may not see them again for a while know that we would always be great friends and would keep in contact no matter what. I first met Pete whilst fruit picking in New Zealand in 1998. Together with a few friends we travelled through New Zealand and stayed in a house together in Queenstown for a few months. We lived together in Sydney, Australia too until we eventually made our way home via South East Asia in mid-1999.

It was with great shock in December last year that I received a text message from our friend Hugh with a link to a newspaper article in Australia accusing Pete of being involved in illegal activities. Having known Pete for 16 years I have always found him to be straight as a die. I have never known him to be involved in any illegal activity, which is something I would have known or found out about if that had been the case, being a good friend of his. Although we haven't really spoken much over the past 5 years I still consider Pete to be a good friend and someone I would trust in a life or death situation. Knowing that Pete comes from a good background and was brought up well was clear to

me from the first minute I met him in 1998. If I had found him to be of dubious character I wouldn't have ever travelled and lived in New Zealand, Australia, travelled Thailand and socialized with him in London over the years since. Pete has always struck me to be a hard working individual with great morals, attitude and integrity. Someone, who is willing to help others and will always, put *you* first over his own personal gain or benefit. Someone I could trust with my life.

Sincerely,

Grant Finlayson

Anatole John Franklin
49 South Eastern Road
Ramsgate CT11 9QF
United Kingdom
+44-1843 581484

Re: Character reference for Peter Phillip Nash

10 November 2014

To whom it may concern,

My name is Anatole Franklin of 49 South Eastern Road, Ramsgate, UK, BA (Honours) Financial Services, CeMAP[1], FPC1[2]. In my previous employment at the Nationwide Building Society, I served in various roles over a period of 13 years, including as a Senior Customer Advisor, Mortgage Consultant and Customer Account Manager. Since the birth of my son in April 2012, I am a stay-at-home father.

I have been asked to write a character reference on behalf of my close friend Peter Phillip Nash, whom I have known for more than 20 years since we met through mutual friends. In addition to our longstanding friendship, I have known Peter as both a tenant and a housemate, as I was his landlord for 3 years when he rented a room in my house, in which we lived with my brother and one other friend. I provide this reference in full knowledge that Peter has been charged with conspiracy to commit computer hacking, narcotics trafficking and money laundering. These offenses strike me as a completely uncharacteristic aberration that I believe Peter sincerely and intensely regrets.

In the time I have known Peter, our friendship has stood the test of time through a vast range of experiences: from seeing each other daily while living under the same roof to being apart for sometimes years and over long distances, since his emigration to Australia. As such we have experienced both closeness and periods of lesser contact. Nevertheless, despite in recent years having lived far apart, we have stayed in regular contact, not least due to the fact that Peter has always been very reliable at keeping in touch by emails, phone calls, or even if it meant sending just a short text message at Birthdays, Christmases or New Years. I have always appreciated this thoughtfulness of his, and I believe that being in touch regularly is also what has made it easy for us to pick up where we have left off whenever we see each other again, for example, the last time when Peter visited the UK in the summer of 2012. To this day, I consider Peter to be one of my closest friends.

We have been in regular contact since his arrest in December 2013, initially via letters and more recently by email, and I believe that Peter profoundly regrets what he has done. In my opinion, his actions since his arrest, including not requesting bail and forfeiting his right to fight extradition to the USA, are clear signs of his willingness to take responsibility for his transgressions and make amends by facilitating a swift resolution to his case. Although he himself has, as a result of his actions, suffered the loss of his job, reputation and indeed his freedom, he speaks of "holding it together", and his foremost concern is not for himself but for his loved ones. His letters reveal a deep sense of responsibility for the devastating impact his actions have had, particularly on the lives of his elderly parents, Jean and Frank, and his girlfriend Claire, who it is my understanding he was

---

[1] Certificate in Mortgage Advice and Practice, which is a QCF (Qualifications and Credit Framework) Level 3 qualification that meets the educational standard required by the Financial Conduct Authority (FCA) of anyone wishing to achieve a 'licence to practice' and work as a mortgage adviser.
[2] Financial Planning Certificate 1

preparing to propose to. His words cannot hide the distress he feels over the pain and damage he has caused.

As Peter is an only child and I currently live in close vicinity to his elderly parents, he has asked me to look after them in his absence. As such, I have witnessed first-hand the devastating effects this ordeal has had on Peter's mother Jean and his father Frank, not only psychologically, but also physically and financially. Having previously suffered an aortic aneurysm that led to a pulmonary embolism, Frank has recently suffered a relapse, specifically, a ruptured abdominal aortic aneurysm, and remains in very poor health. Indeed it is unlikely that he will ever be well enough again to travel long distances. To support their only son, whom they love dearly, they have significantly re-mortgaged their modest home and spent a great portion of their retirement savings to finance mounting legal costs in Australia and the USA. Both suffer from extreme stress and are anxious to see their son again.

I can say that in the more than 20 years that I have known Peter, he has always been a decent, hardworking and trustworthy person, and I believe that any behaviour he displayed that has caused him to be charged was completely out of character. I have always found him to be considerate of his friends — for example, when he was living in my house, he was conscientious about paying his bills and completing his share of the household tasks — and extremely loyal, which is reflected in the way his friends have rallied across continents to support him in his current situation. Moreover, I remember being awed by the dedication with which he pursued his studies to become a Developmental Disabilities Nurse and a Behavioural Specialist, as well as the time and effort he was willing to commit to obtain the relevant qualifications.

In my eyes, Peter has always been an extremely community-minded individual who regularly places the needs of others, especially those of the less privileged, before his own. This is of course best evidenced by his more than 20 years working to support adults with disabilities, and the various positions he has held, including for the UK National Health Service and the Queensland Government. I believe that the level of senior management he achieved and the awards he has received in recognition for his work are further proof of the earnestness, commitment and responsibility with which he has performed a highly challenging job. Despite the extreme demands of working with disabled individuals, including mentally unstable and at times very violent people, Peter has always been enthusiastic and passionate about his profession, which I continue to view with the utmost respect.

I am writing this letter in the hopes that you will see that Peter is, despite the transgressions for which he is facing charges, a kind, dependable and well regarded individual. To the best of my knowledge, Peter has no prior convictions and has never before been charged with a criminal offense, and in my honest opinion is not likely to ever transgress again. Without a doubt, Peter is incredibly remorseful of his actions, and I believe this has been reflected in his efforts to make amends. I hope you will consider Peter's longstanding services to the community, as well as his strong commitment to his family.

Sincerely,

Anatole J. Franklin

Nicholas Gordon

43 Mafeking Avenue

Brentford, England

TW8 0NJ

Dear Judge Griesa,

My name is Nicholas Gordon and I am writing to you on behalf of my good friend Pete Nash.

I have known Pete since 2005 and during our first encounter I was immediately struck by his friendly and accommodating nature. Over time I recognised how loyal and protective he is of those he cares about and toward those who cannot readily defend themselves. I particularly recall one incident of an altercation between him and a longstanding friend of his by the name of Jon. The incident occurred at Pete's apartment when Jon tried to take advantage of an inebriated woman who was a mutual friend of the group. When Pete was informed of Jon's behaviour he immediately confronted him about the matter over which they both became embroiled in an argument. Subsequently, Pete forcibly removed Jon from his residence, as he simply did not condone such behaviour.

Pete has also displayed great amounts of empathy and understanding toward those who've endured hardships, in this instance a friend of his from New Zealand (apologies as I cannot recall the gentleman's name) who, after a good night out, broke down explaining to us he was gay and that he had yet to come out to anyone, in particular he was fearful of revealing this to his family. I was greatly impressed by how Pete rallied to his side, and using his professional skillset, one borne out caring for others, managed to alleviate the gentleman's fears; indeed by the end of their discussion Pete had him smiling, even enabling him to muster the strength required to tell his family. It was such an out-of-the blue moment that to this day I admire how Pete took it all in his stride and managed the gentleman's concerns.

Pete has helped me on numerous occasions, including a time when I had split up with my girlfriend who'd decided to show up whilst I was out with friends (and still nursing a sore ego) compounding my negative feelings. Coincidently and rather fortunately I bump into Pete whilst in this dejected mood. After explaining the situation Pete insists I join him for the weekend for drinks to take my mind off things. He introduces me to his friends who thereafter become close friends of mine, too; in fact I would go as far to say that they became like another family to me – we shared many nights out and fantastic experiences and at the centre of it all was Pete.

On the rare occasion where Pete and I haven't seen eye-to-eye he has always been quick to apologise – this I consider a trait typical of someone who values friendship.

Your Honour, simply put Pete puts others first in his life, this is no more evident than the profession he decided to embark on as a Behavioural Specialist in a residential care home and then in the forensic services within a secure unit. This is not a profession someone enters into for self-interest or money making. He helps others overcome problems under great duress and sometimes under the strictest of confines. My current girlfriend of 7 years is in a similar profession as a Mental Health worker with experience of working within a secure system caring for those with psychological issues. Therefore, I can personally attest to the type of character these individuals are: selfless, empathetic, caring, self-sacrificing and relentless in their pursuit of caregiving. I truly wonder as to how they maintain such levels of devotion toward those less fortunate than us.

During our correspondence Pete has expressed abject and immeasurable remorse. He knows he has let everyone down including himself and greatly wants to make amends, especially to his parents and his girlfriend, Claire, whom he cares about immensely. In his last correspondence Pete stated his goal of wanting to get his life back on track as quickly as possible.

Your Honour, when sentencing I hope that you take all of the above into consideration, as well as the fact that Pete has, since his arrest, been imprisoned in Australia, then (voluntarily) extradited to the U.S. where he has fully cooperated with law enforcement. Also, due to extradition I believe he's had minimal, if any, contact from friends and family. Concerning his career, I doubt much he will be allowed to continue in that profession. I also understand that Pete's parents are of age where a great length of time will have the severest impact on them.

Personally, my chief concern for Pete is the impact the system will have on him – that he may come out a far worse individual than the one who entered it, because then I will have truly lost my friend and society a genuine person who selflessly gives to others.

I sincerely state that if I believed Pete to be deserving of severe punishment and that he committed the crimes as an individual who has no regard for others, with little or no conscience to speak off, your Honour I would not commit these words to paper. Pete up until his mistake was, and is, an upstanding citizen who has made a grievous mistake, one I personally know he will never make again.

Thank you for your time and consideration.

Nicholas Gordon

9 Aquarius Court
Mt Gambier
SA 5290

Dear Judge Griesa,

I understand that you will be sentencing my friend, Pete Nash. I have known Pete for 16 years and during this time have come to know him very well as a friend and as a confidant.

I first met Pete in 1998 whilst backpacking in New Zealand, we met in caravan park where we were staying whilst apple picking to fund our future travels. The group of people I met at this caravan park, including Pete, have gone on to become my closest friends and we have travelled, lived and worked together in many places, over many years.

The expatriate lifestyle that I lead often makes it difficult to maintain friendships due to the large distances involved. Pete and I have always stayed close as he and I made a conscious effort to keep in touch, I respect that as it means so much when you're overseas to have people contact you out of the blue.

Pete has always had a genuine compassion for helping people. In his job as a Behavioural Psychologist he tried to rehabilitate some of the most challenging individuals possible. Some of these people were so ill that they will never live without 2 full time carers. I was always amazed about how Pete was able to keep going with little to no visible signs of improvement. He genuinely believed that he was improving them and their families lives. He was passionate about this, he never stopped pushing to help his patients even when it negatively impacted his home life.

In 2009, Pete underwent an introspective journey. He went through a process of analysing his behaviours and his interactions with those close to him. He undertook some fairly intensive training exercises to help himself become a better son, partner and friend. I was living with Pete at the time and saw the notable change in his persona. He became much more emotionally conscious of his actions and how they were perceived and understood by others. He made massive inroads into relationship with his parents and his entire friendship group were taken back by the change. At this time I had separated from my wife and I wasn't in a very good place. Pete encouraged me to undertake the training as he felt it would only be beneficial for me, I reluctantly agreed. The training was incredibly powerful and enlightening, I still reflect on learnings from that time today. In 2010 my wife and I reunited, we are now together and happy with an 18 month old son in tow. I have no doubt whatsoever that the training was instrumental in me becoming a better person, which positively contributed to the reconciliation of my marriage.

The situation that Pete now finds himself in shocked his friendship group to the core. The gravity of the charges he faces doesn't reflect the Pete I know as a human being and as a friend. Pete would not wish to knowingly harm others including strangers, it's just not him, he's the polar opposite of that person. If he has made an error in judgement, as it would appear, then I believe he is truly sorry for that but would also take full responsibility for it. He has always held himself accountable the whole time I have known him and has never looked to blame others.

I believe that this world is a better place when Pete is able to live and work within it.

Yours Sincerely,

Hugh Gorman

Dear Judge Griesa,

I am writing to you today to express my hope that my account of my relationship with Pete over the last 15 plus years will give you some insight into the man I believe him to be and will allow you to look favourably on his case.

I first met Pete in 1998 when I migrated to Australia, in fact he was one of the first people I met and we got along famously immediately. I found he understood what most people were about pretty quickly which is a very valuable character trait. Since that first meeting I found him to be open, honest, direct and a very good friend.

I remember thinking that he was a bit mad when he told me what he did for a living. His official title was Clinical Nurse and the word quickly spread. He got an awful lot of stick from all of us but he was always remarkably sanguine about the 'abuse' we gave him and just got on with his work. He was frustrated that he couldn't stay in Oz doing what he clearly loved and was passionate about because the care system in Australia, at that time at least, was significantly behind what he had been doing in the UK. He left Sydney about a year after I met him and he was quite envious of the fact that I was able to stay there long term as he found the place resonated very well with him. His last words to me were the infamous, "Don't you worry Lenehan, I will be back mate, just you wait."

Pete and I managed to stay in touch over the course of the following 9 or so years, quite an achievement considering the distances involved and how quickly people can fade in and out of our lives. I had been living a very nomadic life for about 10 years prior to moving to Sydney. In fact Australia was the 6th country I had been lucky enough to live in. In each of those places there was always a few special friends that somehow, no matter what happened, we managed to find a way to keep in touch. I am very happy to say Pete is one of those special people.

I have a vague recollection we hadn't emailed each other for quite a while, it could easily have been as much as a year, and then out of the blue I heard from him. He had returned at last to Australia, having finally managed to find a way back to Oz as he had threatened all those years ago.

He was in pretty difficult circumstances when he did get in touch. He had moved to Oz with his girlfriend and she had promptly broken up with him almost as soon as they arrived. This left him in the unenviable situation of having completely packed up his life in the UK, fitting out an entire house with furniture, TV. etc. and then his girlfriend just upped and walked away, leaving him with all the bills. At the time I was living in a two bedroom place with a spare bedroom and I was initially skeptical about him moving in as I had a few bad experiences living with friends in the past but he managed to convince me it would be a good thing. To this day I am grateful that he persuaded me to let him.

I introduced him to all of my friends who took to him immediately. He fully integrated himself into all of our lives very quickly and without resistance from anyone. He was always very grateful for the open introduction I gave him to my circles of friends and I was happy to introduce him as he proved to be everything I had always thought about him; a thoroughly decent guy, very entertaining and always made an effort to make the most of the relationships that came his way.

As a result of Pete being around, a friend of mine Evin and I became much closer and we remain so to this day and I credit Pete with making that happen. Evin and I had known each other for several years but we had never found a really good connection. Pete brought out another side of Evin I had not seen before and don't think I would have seen but for Pete's intuition and ability to see something more beneath the surface. There were other relationships that became much stronger as a result of this change in Evin and again I don't think this could have happened without Pete's presence. Pete has never stopped thanking me for opening my life to him, but I have not, before writing this letter, thanked him for enriching my life and my friendships. I miss his presence and being able to communicate with him and will always have a place for him in my life. Pete has consistently been funny, creative, open, warm and generous of spirit and of material things. I owe him so much and it saddens me a great deal to see him in his current situation.

Pete went on to secure a great job in Sydney and almost as soon as he had started he introduced me to his new employer as their IT systems were severely lacking and were costing a lot in lost time and money. Each and every one of the people I met with there spoke very highly of Pete and the owner of the business became one of my best clients for the remainder of my time in Sydney. Even after Pete moved to Brisbane for a role that was better suited to his skills his ex-boss and I frequently reminisced about Pete and how we missed his big smile about the place.

She was initially a bit angry about him leaving but she realized the role that he had landed was better for him as it would allow him to put into practice all the things he had spent years learning in the UK. He was so happy with that role but torn by the fact that he had to move to Brisbane to take it up and leave behind all the new friends he had made in Sydney.

Since leaving Australia I have stayed in close contact with Pete and have seen him continue on his chosen path with some big successes along the way. He has always remained true to his calling and I retain great admiration for him and what he does. I could never imagine how difficult his job is and how much energy it takes to do it. Some of the people he has worked with over the years would challenge anyone's patience and physical abilities and the fact that he has stuck with it through thick and thin speaks volumes for his dedication and his enthusiasm for what he does. His role is one that goes, for the most part, unnoticed. In fact the only time it ever gets noticed is when something goes wrong. This only increases my respect and admiration of him. Doing a job as tough as he does with almost zero discernible improvements would seem to me a thankless task but somehow he keeps doing it. I really don't know how he does it. On top of that he has never spoken negatively about any of the people that have been in his care. Yes, he says they are very difficult and goes through a litany of amazingly bad things they have done but he has never spoken about them in anything less than respectful terms. I never witnessed him calling them names or referring to them in derogatory terms or suggesting they were any less human or deserving of his care than anyone else out there.

To my mind this would be reason enough to allow back to his life and what he does as there are so few people willing to do it and even less that can do it as well as he has done throughout the time I have known him.

I will always be happy to call Pete one of my best, life-long friends and would vouch for his character until I'm blue in the face. He is a thoroughly decent man who is aware of his issues, has never shied away from his responsibilities or doing the hard work to make himself a better man.

We have all been saddened by Pete's situation and to say we were shocked by the revelations is putting it mildly. It would seem Pete made a massive error in judgement but I believe he has taken responsibility for his actions which is fully in line with what I know of Pete. With that in mind I sincerely hope you can find a way to allow him back to his loving friends and family and with some luck and hard work, back to being able to provide care to some of the most vulnerable people in our society that desperately need people like Pete to care for them and help to train others to do so also.

Yours sincerely,

Kraig Lenehan



AECOM Australia Pty Ltd    +61 2 8934 0000    tel
Level 21, 420 George Street    +61 2 8934 0001    fax
Sydney NSW 2000           ABN 20 093 846 925
PO Box Q410
QVB Post Office NSW 1230
Australia
www.aecom.com

10 November 2014

**Judge Griesa, United States District Court for Southern Region of New York**

**PERSONAL REFERENCE : PETER PHILIP NASH**

Your Honor,

It is my honor to provide a personal reference for the character of Peter Philip Nash. I am aware of the serious charges that Peter faces, his guilty plea and the ongoing contention of some aspects of the case. I am also very aware of the challenges Peter has endured and risen above during his incarceration and extradition while awaiting trial, and the humility and grace with which he has dealt with such a pressing and stressful situation.

It is indicative of Peter's character that his mother in the UK recently received a phone call from the mother of a young man in the US who had found himself in trouble and before the Courts. She told her how helpful and generous Peter had been in assisting her son, someone previously unknown to him and with limited means and education, prepare for his trial and that his assistance had contributed significantly to the positive outcome. The call was great comfort to his mother, given his current circumstances, but no surprise to any of us who know him.

Peter has been a personal friend for over five years, during which time we have shared the lightness of laughter and joy, and the weight of challenge and regrettable sadness. The depth and authenticity of our friendship is reflected in Peter, and his partner Claire, being guests in my home for family Christmas dinners and life celebrations.

I first met Peter in 2009 just as he was embarking on an exciting new chapter in his career and moving from Sydney to Brisbane to work with the Queensland Health Service to develop a new program to support some of the most challenged and challenging members of our society. I watched as Peter threw himself wholeheartedly and proudly into his role, achieving meaningful results, winning awards for the program, and support and accolades from senior ministers and public servants. It was great to see his efforts so well received, however it was also concerning at times to witness the personal emotional toll of working in such a stressful environment weigh on him. It was with admiration that I went on to observe Peter bring new tools into his life to assist him in these stressful times such as participating in a men's group and self-development programs, embrace a challenging exercise regime, spend quality time with friends and enjoy a grounded, loving, romantic relationship.

I know Peter to be intelligent, caring, honest, funny, generous, determined and passionate. To his friends and peers he is a solid friend, confidante, employee, mentor, and emerging leader in our community. To hear that Peter was accused of these crimes was, and is, a shock to all of us. It is completely out of character and contradictory to whom we, and certainly I, know him as. While I realise, and am saddened, that as a result of this legal trespass Peter has seemingly lost his career – a loss to his field and our community; I also know that our community will benefit from his ongoing contribution, and therefore his empowerment, in any capacity that he decides to or, based on the Court's decision, is able to apply his gifts, skills and energy.

I appreciate that the decision before the Court, after consideration of all clear evidence and statements, as well as penalties thus far endured, is how to bestow appropriate justice while also maximising the opportunity for positive 'rehabilitation' and social contribution. Rumi speaks of justice as to water trees and not thorns; for *'justice consists of bestowing bounty in its right place'* as *'not every root will absorb water'*. Abraham Lincoln thought that mercy bore *'richer fruits than strict justice'* but he and Rumi agreed that both have their rightful place and perhaps this situation is one well suited to both. Peter is a good person with potential for a great and giving future. Our community will be better off with him in it. I humbly ask, through the Court's wisdom, that your merciful bounty be bestowed on Peter; enabling this much loved tree to start growing once again and its tired roots be brought back to life with the water of your justice.

Yours faithfully

*Donna Lorenz*

Donna Lorenz
*[Personal Address: 10 Avoca Street, Bondi NSW 2026 Australia | Email: donnaleelorenz@yahoo.com.au]*
Associate Director - Sustainability & Climate Change
donna.lorenz@aecom.com

Mobile: +61 413 700 096
Direct Dial: +61 2 8934 0492

Dr Jonathan Mason

U3303, 27 Boardwalk Blvd

Mount Coolum

QLD 4573

Australia

jonmason@rocketmail.com

1/11/14

Your honour,

My name is Dr Jonathan Mason. I am writing to you to provide what I hope will be important information in relation to the character, conduct and values of Peter Phillip Nash, who is appearing before you on a range of charges relating to the website known as *Silk Road*. I hope that the information I provide below will also help in some way to explain why, in my view at least, Peter has come to this point in his life.

Briefly, I am a clinical psychologist. I currently work as a Senior Lecturer in Clinical Psychology at a university in Queensland, Australia. I hold joint UK-Australian citizenship, having moved to Australia form England in January 2009. I have known Peter since shortly after moving to Australia – initially on a professional basis and, after I left my role as a Senior Executive in the Queensland Government, as a friend.

I first became aware of Peter when I commenced in my role as Director of Clinical Practice for a large team of health professionals in Queensland immediately after arriving in Australia. Having attended a number of meetings with senior executives in the Department I worked for, I was aware that he was well regarded for his nursing skills, his commitment to the human rights of people with intellectual disabilities and, in particular, to reducing the use and impact of seclusion and restraint on people with challenging behaviour. I was also aware that he and a colleague had won a prestigious award from the Minister for Disability Services for their work in supporting services to bring the plans and strategies formulated by clinicians to life in everyday service settings. In my mind, this skill set Peter apart from many of the others that I worked with, identifying him as someone who valued the practical applications of assessments and reports rather than just the words themselves.

In July 2010 I was asked to set up and, subsequently, run Queensland's first Forensic Disability Service. The service was intended as a therapeutic response to people with intellectual disabilities and severely challenging behaviour that bought them in to contact with the criminal justice system, and was governed by a new piece of legislation that Peter and I also eventually helped to draft. As the leader of a flagship government project, I was given significant latitude to handpick staff from around the state in order to assist me, and Peter was one of the first people I turned to for help. Initially Peter assisted me with project management, but over time it became clear that he had the skills and capabilities to provide a greater leadership role within the service. Eventually, Peter's role came to involve the overall day to day management of the service, working closely with staff to model effective ways of therapeutically managing the extremely challenging behaviour of our clients using techniques

Dr Jonathan Mason

U3303, 27 Boardwalk Blvd

Mount Coolum

QLD 4573

Australia

jonmason@rocketmail.com

1/11/14

Your honour,

My name is Dr Jonathan Mason. I am writing to you to provide what I hope will be important information in relation to the character, conduct and values of Peter Phillip Nash, who is appearing before you on a range of charges relating to the website known as *Silk Road*. I hope that the information I provide below will also help in some way to explain why, in my view at least, Peter has come to this point in his life.

Briefly, I am a clinical psychologist. I currently work as a Senior Lecturer in Clinical Psychology at a university in Queensland, Australia. I hold joint UK-Australian citizenship, having moved to Australia form England in January 2009. I have known Peter since shortly after moving to Australia – initially on a professional basis and, after I left my role as a Senior Executive in the Queensland Government, as a friend.

I first became aware of Peter when I commenced in my role as Director of Clinical Practice for a large team of health professionals in Queensland immediately after arriving in Australia. Having attended a number of meetings with senior executives in the Department I worked for, I was aware that he was well regarded for his nursing skills, his commitment to the human rights of people with intellectual disabilities and, in particular, to reducing the use and impact of seclusion and restraint on people with challenging behaviour. I was also aware that he and a colleague had won a prestigious award from the Minister for Disability Services for their work in supporting services to bring the plans and strategies formulated by clinicians to life in everyday service settings. In my mind, this skill set Peter apart from many of the others that I worked with, identifying him as someone who valued the practical applications of assessments and reports rather than just the words themselves.

In July 2010 I was asked to set up and, subsequently, run Queensland's first Forensic Disability Service. The service was intended as a therapeutic response to people with intellectual disabilities and severely challenging behaviour that bought them in to contact with the criminal justice system, and was governed by a new piece of legislation that Peter and I also eventually helped to draft. As the leader of a flagship government project, I was given significant latitude to handpick staff from around the state in order to assist me, and Peter was one of the first people I turned to for help. Initially Peter assisted me with project management, but over time it became clear that he had the skills and capabilities to provide a greater leadership role within the service. Eventually, Peter's role came to involve the overall day to day management of the service, working closely with staff to model effective ways of therapeutically managing the extremely challenging behaviour of our clients using techniques

that avoided the use of restraint and seclusion as far as was possible. Peter introduced a system for managing physical aggression that emphasised the role of de-escalation over confrontation and made use of series of physical techniques that altogether avoided the use of so-called 'pain compliance'. Peter also managed a large group of staff who, for the most part, were working with our specific client group for the first time.

Notwithstanding the fact that it was thrilling to be involved in a new, well-funded and prestigious initiative, Peter quite obviously found the work very stressful. He worked extremely long hours, dealt with physically confronting situations on a daily basis, was bullied by junior staff who disagreed with his emphasis on human rights and performed on-call duties alongside me and one other senior psychiatrist. Over time, the stress affected the three Senior Practitioners in the service in different ways. Whilst my marriage was undoubtedly affected, the senior psychiatrist who worked as the third Senior Practitioner (a statutory role under the legislation with a range of significant responsibilities) alongside Peter and I became very physically unwell. Peter, I now know, used drugs to help him manage the stress and the fatigue of the role. Peter would often arrive at work very early in the morning, being unable to sleep through worrying about the development of the service and the safety and wellbeing of the clients. I was aware that his alcohol use increased in order to help him relax outside of work, and was also aware that he struggled to find the motivation to do some of the things that had previously interested him.

I'm aware that, after I left the service at the end of 2012, Peter found it increasingly difficult to cope. We had established a method of managing the stress of working in such a challenging role together that involved open communication, mutual trust and an unwavering commitment to the mission of developing a service that the community could be proud of. Peter and his new manager struggled to adapt to one another's working style, and I strongly believe that this provided Peter with a need to rely even more heavily on drugs to cope with the emotional and physical burdens of the role.

Peter's arrest came as an enormous shock to me, as it did to most. Whilst I am sure the family and friends of many people who are taken in to custody have a similar experience, my strong belief is that, in Peter's case, the sense of shock that most people felt is also reflective of their belief in Peter as an honest, caring and values-driven man. When I reflect on my time working with Peter, what I most remember is our time spent developing ways for the clients of the service to develop a means of managing emotional problems more effectively, and it is enormously sad to think that Peter - to a certain extent - sacrificed his own ability in this regard to help others. I found Peter's dignity and poise whilst in prison remarkable, and was not in any way surprised to hear that he spent much of his time helping others who needed support with the practical tasks associated with mounting their own defence, such as with letter writing, reading and research.

Whilst Peter clearly bears responsibility for his own actions, I also believe that he was let down by a system that failed to provide him the support that he so obviously required. Peter is certainly not the only Senior Practitioner in the service to have struggled to cope, but the system failed to reorganise itself in a way that provided adequate support to the staff members made vulnerable by virtue of the nature of their work. Unfortunately, this is not uncommon in my experience, but nonetheless I believe it would be over simplistic to identify Peter as a lone culprit in an otherwise perfect system.

Finally, a word on my view of Peter's prospects for the future. Working as he does with offenders in his professional life, I believe that Peter has a good understanding of the processes of personal change

and relapse prevention. I believe that he will be able to reflect on the factors that brought him to this incredibly difficult point in his life and understand what needs to be different in his future to prevent future drug use or, more broadly, involvement in the online community of drug users and sellers. For my own part, I can certainly offer any and all support that Peter requires upon his eventual return to Australia.

I write this letter not just in mitigation for Peter, but also to provide more context to your understanding of Peter as a person, as well as my understanding of why he erred. In applying the law to the facts of his case, I hope most sincerely that his pervious good character, service to the community and unrecognised vulnerability in the face of significant workplace pressure can be taken in to consideration.


Yours sincerely,


Jonathan Mason

Jean Nash

46 Foads Hill

Cliffsend, Ramsgate

Kent. CT12 5EN

22nd October 2014

The Honorable Thomas P. Griesa

I am Peter's mother Jean Nash.

I need to tell you about some of the good things Peter has done, he has raised money for the prostate cancer charity by growing his facial hair, he helped to turn the department around he worked at in Australia and they got the ministers award for that. In the Brisbane floods he was out on the streets helping with the clean-up.

We have always been very proud of our son he is a kind caring sensitive person always ready to help anyone. When he was at school his teacher told us that Peter had admiral qualities in that he would take the blame for his buddies to save them getting the blame. I feel worried about these people who know nothing about my son as a person and are about to decide on what is to happen to him very soon.

Peter spent three years training to be a nurse and has spent most of his working life helping people, he gets on with everyone he meets and has so many friends they all want to help him now but do not know how to so they are supporting peters dad and myself through this nightmare and we feel so lucky to have them. Peters' dad is not in the best of health and all we want is to be able to hold our son close again.

Yours Sincerely

Jean Nash

J Nash.

To The Honourable Thomas P. Griesa,

My name is Ofra Nir and I am a close friend of Peter Nash.

We got to know each other through a mutual friend about 7 years ago when we both lived in Sydney in the Eastern Suburbs area.

Peter from the beginning was always very helpful and kind hearted. We became closer when I broke up with my boyfriend and he was there to help me move out, support me with conversations and give me great advice as an older brother.

He always has been and always is very protective of me and is to me like a brother.

When I moved to Brisbane we became really good friends when I lived there 3-4 years ago and were spending a lot of time together.

Not knowing any friends or anyone there. Peter took me under his wings and showed me where everything is, where to buy, what's the best area to live and introduce me to some lovely friends too.

He let me stay in his apartment when it took me a while to find a new home and always let me feel welcome and never asked anything in return.

Peter introduced me also to the spiritual community in Brisbane, picked me up when I got injured in my shoulder and connected me to the therapist that fixed it.

He took me to workshops that he knew about and we went through the deepest journey together of self healing and love.

Peter will never hurt anyone else and always do his best to prevent anyone else of getting hurt. In situations of arguments between people around us he will always be on the side of the moral and the fair person and will protect the weak and less advantage one.

He is very enthusiastic about his ideals to create a better world. for example in his line of work in the prisons he was so protective of the prisoners, he understood that to simply outcast and punish the people that have severe mental problems and that have hurt other people because of those issues is not the way. He has such a big heart and understands that to change the situation society needs to help these prisoners cure from the illness and rehabilitate them into normal life in the community, which actually demands one to have so much compassion and acceptance of the other even if they were in their darkest place and to try and help bring them back. to give them hope that they can change and by that creating a better society that deals with the core of the issue and not only the symptom.

Peter is a beautiful person. true friend and a good man. Everyone makes mistakes and get lost sometimes, but in this case I can say that I know Peter did lose his way, although he is a person that can contribute so much to the community. If given the chance he can prove how to channel all his powerful energy towards things that can improve our society.

I believe Peter was behaving out of his character and the actions that happened do not define him as a whole. He has done a huge mistake but I hope you can see who the person really is. so he can come back to our society and be a part of it and a positive influence as only Peter can.

Sincerely,

Ofra Nir

30 September 2014

The Honorable Thomas P. Griesa
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**RE: Character reference for Peter Phillip Nash**

Dear Judge Griesa

My name is Paul Oxnam. I am New Zealand citizen and am employed by the Central Region Forensic Mental Health, Rehabilitation and Intellectual Disability Service in Wellington, New Zealand. I am a Clinical Psychologist registered with the New Zealand Psychologists Board and the United Kingdom Health Practitioners Council.

I have known Peter Nash since November 2011. Peter was my line manager during the 12-month period I spent working at the Queensland Forensic Disability Service (FDS) in Brisbane, Australia. Peter was employed as the service's Senior Manager and I was in a Clinical Team Leader and Clinical Psychologist position. Towards the end of my time at the FDS Peter and I became friends and we maintained email contact following my return to New Zealand in December 2012. I have continued to write to Peter during his incarceration and have been kept abreast of the details of his case by Dr Jonathan Mason, a mutual friend and the former FDS Director. I understand Dr Mason has also provided a character reference for Peter.

Peter was second-in-charge at the FDS and was responsible for the day-to-day operation of the facility. In addition, he was statutorily responsible for half of the service's clients (also known as "patients"). In his role I observed Peter as passionate and hard-working. He wanted the best for the FDS client group and would not stand for poor conduct or lack of effort within the staff team. Peter and I facilitated a group therapy programme together and, on numerous occasions, we worked in partnership to develop innovative care plans for some of the state's most challenging clients. Alongside Dr Mason, Peter was determined to lead the universal implementation of positive behaviour support strategies for the care and rehabilitation of offenders with an intellectual disability throughout Australia.

During the time I worked under Peter I found him to be an encouraging, kind, and thoughtful manager. Peter provided me with numerous opportunities to extend my clinical and leadership skills and he always ensured there was organisational support for service initiatives I wanted to implement. I felt that I could speak honestly to Peter about my weaknesses and could confide in him during times of stress.

I will always appreciate the kindness Peter showed me when my wife experienced a stroke in August 2012. My wife's illness necessitated my premature departure from the FDS and our relocation back to New Zealand. Peter could not have been more patient or supportive during this period. He ensured I put the wellbeing of my family first and he never let on how much my departure was going to stretch the service's resources and his personal workload.

Because I had moved back to New Zealand before January 2013 I am not able to comment on Peter's behaviour during the period of the indictment. In recent months, however, I have come to reflect on the life events that may have precipitated his involvement in illegal activities. Specifically, I can recall observing a marked increase in Peter's stress levels during the final third of 2012. This period began with Dr Mason's departure from the FDS as part of government restructure. Dr Mason was replaced by a person with significantly less experience and a somewhat more emotionally expressive management style. Whereas Peter and Dr Mason worked in sync and with clear division of roles, Peter and the new Director struggled to communicate and form a collaborative partnership. Peter's workload increased significantly as he was required to undertake additional tasks and ensure the new Director was adequately supported.

Dr Mason's departure from the FDS coincided with the service receiving the admission of a new, high-profile client. The client's presentation necessitated the rapid construction of a specialist secure unit and the recruitment of a bespoke team of support staff. Within a week of arriving at the FDS the client had destroyed parts of his unit and had assaulted four members of staff. Peter, the new FDS Director, and I came under departmental scrutiny for the service's handling of the client's admission and Peter, in particular, was tasked with managing union concerns and complaints from staff.

During my final week at the FDS I recall Peter arriving at work looking increasingly fatigued. He was unshaven, not eating properly, and had ceased his usual exercise routine. On my last day he came to share that he was no longer coping and was drinking alcohol most evenings in an attempt to ameliorate the stress of work. Peter said he felt "stuck" and could not see a way forward in either his workload or his relationship with the new service Director.

I have no doubt that Peter will find life as a sentenced prisoner in the United States to be isolating and frustrating. He is a long way from home and the friends and family who can enrich a prisoner's existence. Peter understands the impact of his incarceration on his partner, Claire, and he will be particularly fearful of losing his father, who is too unwell to travel to see him.

Through the letters he has sent during his incarceration it has been pleasing to see that Peter is doing his best to maintain a positive outlook, a healthy routine, and a busy mind. He has been reading widely, playing chess, and assisting other inmates to attain high school qualifications. My hope is that Peter will eventually receive specialist psychological assistance to formally address the factors - such as overwhelming stress - that led up to and maintained his offending behaviour. Having provided psychological treatment for prisoners, like Peter, experiencing mental health and offending-related difficulties, I am certain that he would openly engage in any treatment the justice and probation systems can offer.

I am available to be contacted via the details below should you require more information.

Yours sincerely,

Paul Oxnam
BCA, BSc (Hons), MSc, PGDip.Clin.Psyc.
Clinical Psychologist (Registered)

Phone: +64 212 067 683
Email: paul.oxnam@ccdhb.org.nz

2

33a Annois Road
Bibra Lake
Western Australia
6163


28 October 2014


Dear Judge Griesa,

It is with a very heavy heart that I am writing this letter today regarding my dear friend Peter Nash.

I am from Peter's hometown in Kent, England. I first met Peter 20 years ago when he was introduced into our group of friends by my younger brother. As a group we would spend every weekend together, going on trips, having fun and basically enjoying life. Peter was always the responsible one who looked out for everyone and made sure we all got home ok, hence earning the nickname "Mother Hen". He was always the one with the good job, earning good money and would never hesitate to help out a friend financially if needed. I find these particularly interesting characteristics of Peter as he is an only child and did not grow up with siblings to nurture. This, for me, is a true sign of his strength of character and his strong desire to look after his own.

As the friends in the group grew older, some got married and had children, some moved away and not everyone stayed in touch. However Peter has very strong loyalties and has always made a big effort to stay close to his friends – often being the common denominator when other people drifted apart. I think this is highlighted in the huge support he is receiving from friends around the world.

Personally I have always remained close to Peter and his is a friendship I value greatly. In 2004 we became housemates in London, UK and I lived with Peter (and his girlfriend at the time) for approximately 2 years. During this time I remember what Peter enjoyed most after a hard day's work – a home-cooked meal followed by a glass of wine whilst lying on the sofa watching nature programmes. He is the biggest animal lover I know and has a deep connection with nature and the outdoors.

I also remember when Peter broke one of my sherry glasses which had been given to me by my recently (at the time) deceased grandmother. It was just a glass but he was devastated as he knew the sentiment behind it and it was moments like this when my respect and love for him grew even more.

Peter's career is also a testament to his ability to care for others. He has spent most of his adult life nursing and caring for people with mental disabilities. In the UK he was managing government houses where disabled people could live in society normally, without the need for an institution. He was extremely good at his job and able to handle any situation with authority and in a calm and effective manner.

In 2006 we embarked on a 3 week holiday together from the UK to Australia, to attend a mutual friend's wedding, for which he was best man. He carried this honour with pride and did a great speech in front of everyone.

In 2007 Peter emigrated to Australia and I emigrated to South Africa. Unfortunately none of our trips back to the UK have coincided so I have not seen him since 2007, even though we have remained in touch. When I emigrated to Australia in 2013 I was so looking forward to

seeing him again and meeting his girlfriend Claire, even though we were still a 4 hour flight away. Fortunately I have had the opportunity of meeting Claire anyway as she came and stayed with me for a weekend in Perth, after flying over for a work trip. It was not how I imagined our first meeting but I have nothing but admiration for her during this very difficult time while her life is in limbo. I know she has taken extreme strain with the trauma and shock of this whole situation.

From correspondence with Peter I know that his biggest concern is not for himself but for what this is doing to Claire in Australia and his elderly parents back in the UK. I am extremely concerned that he may never see his parents again, particularly his father who I believe is unable to travel due to ill health.

Around the time when Peter was transported to the US, I lost a dear friend of mine in South Africa to cancer. I mentioned this in a letter to him and his response was how this helped put things into perspective for him and he had a lot to be thankful for. I found this astonishing from a man who had lost everything but not surprising from the man I know.

Yours sincerely,

Sarah Pieters

1

Dr Claire Margaret Ryan
25 Wade Street
Wavell Heights
QUEENSLAND, AUSTRALIA, 4012

16 November 2014

Dear Judge Griesa,

RE:  Peter Phillip Nash

My name is Claire Ryan and I am Peter Nash's long-term girlfriend.  Peter was intending to propose marriage to me just over a week after his arrest.  I lived with Peter in Brisbane from March 23rd 2013, up until his arrest December 20th 2013.  During this time I was completing my PhD in organisational psychology and working as a psychologist and Peter worked as the senior manager of clinical services at the Forensic Disability Services, Department of Communities, Queensland.  Peter is 11 years my senior.

I know Peter to be a good man.  He has given his life to working to help others, often people amongst the most disempowered in our community.  I met Peter through a mutual friend shortly after he had been awarded the Queensland Government's Minister Excellence Award for Innovation and award for Staff Excellence for his work developing an evaluation system for positive behavioural plans.  I fell in love with a man driven by a need to better society.  For example, Peter was a strong advocate for non-pain based compliance methods for disability services at a time when staff were not receiving correct training in how to restrain clients.  Passionately moved by this topic, I know that Peter was instrumental in helping to get correct training on the table at the Department of Communities.

When I met Peter he had just been hand-picked by Dr Jon Mason to be part of the commissioning team for a bespoke medium secure disability facility for adults with intellectual disabilities charged with serious offenses.  These clients have complex behavioural issues and Peter helped commission the service and was kept on as the senior manager of clinical services.  I know Peter built high rapport with both his staff and clients and had some initial success with client outcomes.  There is a group of about 12 staff who have kept in contact and ask after Peter's wellbeing.

I saw the work take a toll on Peter.  When I would stay over he was often called three times a night as the on-call senior clinician and also had to physically drive into work in the middle of the night to attend to issues.  During this time I also became aware of the interpersonal challenges Peter was facing at work.  It sounded to me that he was being bullied and I urged Peter to make a formal complaint and to seek psychological help.  The service that Peter had poured so many dreams into was not going as well as had hoped and a series of government cut backs meant that there were a number of changes in staff.  Peter withdrew socially during this time and I only saw him for a short period of time on weekends.  I observed what I believed to be symptoms of burnout (depression) and extreme fatigue in Peter.  Peter told me he was desperately lonely during this period.

The first time I observed what I now believe was Peter under the influence of illegal drugs was New Year's Eve 2012.  We stayed up all night with his friends in Sydney, moving from one party to the next and then watched the sun rise at North Bondi from the sandstone cliffs.  I observed Peter's

behaviour as being erratic and this frightened me – he was climbing all over the cliffs and I know Peter to be afraid of heights. This was out of character and I have taken it to mean that Peter felt invincible and his perception was impaired. I now suspect Peter had taken cocaine that night. Peter learned that we were a little different in our views of drug taking and I wonder if this meant he felt pressured to keep it a secret from me.

After Peter and I moved in together in March 2013 I became aware of Peter's drug dependency. Peter was clearly an alcoholic – he was drinking at least one bottle of red wine per night (every night) but typically it was a bottle and a half mid-week and more on weekends. Due to the distance this created in our relationship and financial outlay I raised my concerns with Peter about the amount of alcohol he was consuming and he told me it was his "comfort drink". I wished I had asked him what he needed comforting from. To Peter's credit he took my concerns seriously and detoxed from alcohol in October 2013. This was a very challenging time for Peter and I observed in him a very low and irritable mood.

On three occasions during my relationship with Peter he came to me, evidently nervous and typically after he has missed an important event for me (e.g., my PhD confirmation session, a family holiday), and confessed that he had an issue with drugs. He explained that during 2012 he started using cocaine to help him manage the fatigue of being on-call and to improve his mood. He also said that he liked to use MDMA to help him "blow off some steam" and also "to feel an emotional connection with people". Each time I thanked Peter for being so honest with me, but by the third time I begged him not to shut me out of the process of him getting back on track. He did not tell me exactly how much he was using but that he had an "insatiable appetite for drugs". I now believe that Peter has learned that he can never touch cocaine ever again as a way to manage his mental health issues. The experience of being incarcerated has brought home what is truly important in life and impressed upon me the importance of being a supportive partner.

I'll be honest – I wasn't the best girlfriend when we were living together. I insisted we have separate bedrooms as I was a light sleeper and it was my final year of my PhD and I was under immense strain. We were like ships in the night at some stages – If I wasn't working on my thesis I was up early to train for the Tough Mudder sporting event (a half marathon obstacle course raising money for returned service personnel). During this time Peter was a huge source of support for me. I live with a significant mental illness (bipolar disorder) and I have developed post-traumatic stress disorder due to my experience of Peter's arrest and I am finding it very hard living alone without him. I've found the stress of this experience profound – when Peter was bashed in prison that was a particularly low point in my life and I was at my lowest weight of 45kgs (99.21 pounds).

I know Peter to be a good man. I can imagine Peter, in need of drugs, finding this online forum and fuelling his addition. I can imagine that he believed that others on the forum were as himself; highly educated professionals seeking drugs for personal use. I can well imagine he rationalized the forum as a way to help others get what they needed in their lives. This experience is sure to have taught him that there are significant risks to society associated with illegal drugs. I have become aware that Peter has significant financial debts, and by my calculations the repayments would have left little spare money for recreational activities and therefore I suspect he took a job as moderator of the chat room to fund his drug use. I never invited discussions of financial debt in our relationship – and

I recall having mocked Peter at one time for being in debt which I regret having done at this time. I imagine this may have made Peter feel very alone.

Peter has already been approached by two of his previous employees who are starting up a rehabilitation counselling services for ex-offenders and would like Peter to work for them. I suspect Peter may take up this sort of work in due time, perhaps helping others to beat drug addictions. During his time in incarceration Peter has done what he can to better himself and others. At the Arthur Gorrie Correctional Centre (jail in Brisbane, Australia) where he was incarcerated following his arrest he worked as a Bail Clarke and was successful in assisting inmates to achieve bail and also took on board the position of unit buddy ("the buddy program"). At the MCC in New York, he has assisted one inmate with their guilty plea letter (which was especially mentioned by the sentencing judge), is working as a tutor to assist inmates to achieve their high school diplomas and is undertaking a cognitive behavioural therapy self-regulation course.

Peter is not a violent man – in fact, I have seen him once at a party, when a friend's boyfriend (who was in an abusive relationship) was aggressively moving toward her, Peter restrained this man even though the man was much larger than him (using his training from his work in the forensic disability service). I was terrified by that man's behaviour and I thought this was a very brave thing for Peter to have done. He is a very caring person – I've been told that he is known amongst his older circle of friends as "the mother hen", looking out for all his friends. Jean, his mother, has told me that as a child he used to rescue the injured animals in his neighbourhood and spent all his pocket money at the vet getting them helped. When Peter had been bashed by the guards in the prison and then deliberately moved into the sex offenders unit (as another sick game of the officers' to stigmatize him and make him a target to other in mates) and I heard Peter at breaking point to me on the phone, I was heartbroken to witness what the criminal justice system was doing to this kind man.

I have taken out a loan and Jean and Frank Nash have sold their home to pay for Peter's legal defence. The sooner Peter is home the sooner he will be able to support me and financially support his parents. I hope that he can be returned home to me as soon as possible and we can rebuild our lives together. I need his support in my life. I am also deeply scared that if Peter does not get a minimum sentence then I will not be able to complete my lifelong dream of having a family as I am already in my thirties.

I know Peter has a lot of good that he can do for this world and I am confident that he will devote his life to doing that. With my support, and the support of key people in his life, I am confident that Peter will never engage in illegal activity again.


Yours faithfully,

Claire Ryan.

Dr Claire Margaret Ryan

My name is Daphne Sidney, I have a Master of Social Work, University of Philippines, Diliman October 1999, and am currently undertaking further studies, Master in Mental Health – Art Therapy at the University of Queensland, Australia. I have extensive experience in working with Child Safety and Disabilities.

I would like to write a personal reference for Mr Peter Nash. I was first introduced to Mr Nash in June 2011 at the training for the newly opened Forensic Disability Service facility. Mr Nash as a Senior Manager, was professional, was welcoming and was able to share his experience in disability work in England which was highly valued.

Mr Nash always treated me with kindness and respect. If I had a difficult situation with a client I was able to call on Mr Nash for help. As an example, I recall one instant where I had a difficult situation and I made a call to Mr Nash, and he was at the unit within minutes. Mr Nash was able to resolve the situation calmly and respectfully. He spoke to the client without further escalating the situation and had the matter settled before leaving. As a social worker I have worked a substantial number of years with disabilities, and know some of the stressors, and that it takes people such as Mr Nash who have a compassionate heart for people with disabilities, but who also have the skills to support and work with clients who have challenging behaviours, keeping a safe environment for both clients and staff. Mr Nash is very gifted in this field and has considerable experience, insights and was always willing to take responsibility for making decisions which had to be made.

During the year of 2013 I worked more directly under Mr Nash. Once again, Mr Nash was always very considerate, kind and respectful towards me. Mr Nash would request certain tasks to be undertaken and trusted that I would achieve them. He would later thank me for the work and express his appreciation. I really appreciated his strong values of compassion and inclusion towards clients, and also the trust and confidence he had in me as a staff member.

Of more recent times, Mr Nash has expressed concerns for his father's health and for the well-being of his parents. I can see that Mr Nash is a loving and caring son who has deep concerns for his aging parents and who wants very much to be there for them.

My close colleagues and I miss Mr Nash very much on a day to day basis. His presence at the office was cheerful and confident. He had warmth as a brother, a good sense of humour and in his role of Senior Manager, was able to inspire confidence in me to help me grow and become a more effective member of staff. My life has been enriched by the knowledge, skill and caring nature of Mr Nash.

Daphne M Sidney.

01/10/2014

Kellie Shaw
Date: 22 September 2014
Contact: kelstra@gmail.com

**To: Judge Griesa**

**Subject: Peter Nash**

Dear Judge Griesa,

I am writing to you with some examples that I hope demonstrate the good nature and strength of character of Peter Nash.

I first met Peter after the end of my long-term relationship, my partner had left me for another woman and I had to move out of his home and find somewhere to live. I moved into an apartment building in Fortitude Valley Brisbane - it was the first time I'd ever lived on my own, it was just after Christmas and I was feeling incredibly sad and anxious about my new life on my own. I'd also had a recent promotion at my work to a manager role which was an incredibly high stress/commission based role, so all round I was at quite a low point in my life.

Peter lived in the same apartment building across the way from me, and we were introduced through some mutual friends of ours who realised that we lived in the same building. From there our friendship because strong and Peter was a very good friend to me during those times as neighbours.

Some examples were things like:

- Helping me with odd jobs in my apartment that I couldn't do myself, e.g. broken shelf, carrying something heavy etc. I remember one time I went to take out the rubbish, the door shut behind me and I was locked outside in my pyjamas! Peter very kindly drove me down to the real estate agent to get the spare set as I didn't own a car (not that I had the keys anyway as they were inside!)
- When I was sick, I recall Peter bringing over to me a home-made hot lemon and honey soup in an urn to help me feel better. He'd also invite me over for dinner if he was cooking.
- The days when I'd be sitting in my apartment, blinds drawn, crying and feeling sorry for myself - Peter seemed to know, and would come and knock on my door, remind me that the sun is shining and I needed to get out and do some exercise, come for a swim in the pool etc. He'd have to drag me but once I'd be outside I felt much better.

I can't thank Peter enough for what a good friend and neighbour he was to me, I ended up moving out because my unit was sold that I was renting. We still stayed in touch though catching up from time to time, and Peter is one of those friends where I might not see him for a few months, then see him and everything is as if we saw each other every day.

Peter has a natural way about him; he is a generous and supportive friend, always helping people. I didn't know too many details about his job but I knew that also was about helping people re-build their lives, and that for his work he had earned a ministerial award, something he is very proud of.

I hope this gives a good example of the kind of person Peter Nash is, I have complete confidence in his character and am happy to assist in any further way required.

Yours sincerely,

Kellie Shaw

Louise Shields

12 Urquhart Road

Thatcham RG19 4RF

United Kingdom


5th October 2014


To Judge Griesa,

**Peter Philip Nash**

I find myself in the incredibly surprising situation of writing this letter for a person I have known for a very large part of my life.

Pete and I have been close friends for almost 30 years, first meeting at school and then cementing that friendship while Pete was at college. Pete is part of a close-knit group of friends who have remained close to me since we first met. I feel privileged that we have remained such good friends even after Pete moved to Australia and we rarely went more than a couple of weeks without contacting each other.

Just before all of this happened we had been contacting each other regularly as he told me about his plans to propose to his girlfriend Claire, showing me pictures of the ring and telling me how he planned to take her to Paris after coming home to spend Christmas with his family. I was so looking forward to meeting Claire, it seemed Pete had found someone he could settle down with and was ready for a new chapter in his life.

Pete has always been someone I could rely on as a friend. At times he was more like a big brother to me, always making sure I got home safely from a night out and offering me as shoulder to cry on when I needed it most. It was no surprise to me when he took a job as a carer, he had a natural instinct in looking out for other people.

I am still shocked by the situation Pete now finds himself in, it is never something I imagined for him or any of my close friends. I just hope that he will be allowed to come home as soon as possible so I, and the rest of his friends, can help him rebuild and move on with his life.


Yours sincerely,

Louise Shields

Charles Tucker
'Ashgill'
20 Binhams Meadow
Dunsfold,
UK.
GU8 4LF

Dear Judge Griesa,

**Ref. Character Statement for Peter Philip Nash**

Peter and I have known each other since a very early age. We grew up together in a small village on the south east coast of England. Like so many small boys growing up, ours was an outdoor life – making a camp fire on the beach, going for a cycle ride, doing an early morning paper round. We both enjoyed a very wholesome childhood, both of us coming from good loving families, and now looking back, we both share so many fond memories from our younger days. They were very happy times for us both.

As young adults, embarking in careers, our friendship flourished and there were many times when one of us needed the support of the other as we headed out into the world. Peter's chosen career, helping people with severe learning difficulties, is something that requires very special qualities. Peter has those admirable qualities. The respect he shows others, an empathetic approach he has towards people, coupled with his strength of character, enable him to interact with those less fortunate than he is and get the best from them. I can remember watching him with a severely autistic child who was being cared for by his Mum at the time. Peter knelt down and spoke to him, and the boy was immediately engaging with him, happy to have a friend at play! To me, Peter instinctively knew exactly how to be, in order for the child to feel completely at ease, and happy to enjoy Peter's attention. This ability to connect with others on a level playing field, always adopting a reasoned, calm, caring, compassionate and professional approach, has seen Peter quite rightly progress enormously in his career.

In 2000 I got married, and Peter was my only choice to be my Best Man. By then, in his late twenties, he displayed exemplary characteristics of someone wholly comfortable with themselves, able to communicate confidently with all, and expressing warmth with every engagement. He has never been arrogant or showy, instead displaying a calm confidence which is always respectful and always admirable. I will forever remember his Best Man's speech, which in so many cases can be full of light hearted anecdotes and fanciful stories. Peter's speech was quite different, an objective appraisal of our lives together, and who we had become, reflecting on the great start to our lives, and the importance of our friendship to each other. It was sincere and full of admiration, and displayed how Peter viewed the importance and gravity of the occasion.

Charles Tucker
'Ashgill'
20 Binhams Meadow
Dunsfold,
UK.
GU8 4LF

Peter has surrounded himself with some great people over the years, and has shown a considerable determination to maintain good strong ties to all his friends. When he eventually emigrated to Australia, some years ago, it was evident that Peter gave a lot of importance to keeping in touch with his friends back in the UK, as well as forging new relationships in Brisbane. Peter's close circle of friends in the UK are all good, kind, decent people, all doing well in their chosen careers, and some have settled down and have families of their own. I haven't met many of Peter's Australian friends, but knowing him, I know he will surround himself with good people, who value the same things in life that he so evidently does.

Peter has forged a healthy and loving relationship with both his parents. From his early adulthood, he has focussed on making his relationship with his Mum and Dad respectful, loving, caring and understanding. He is fortunate to have such a loving family to support him and help him through difficult times. Peter's girlfriend Claire, has worked tirelessly to help him during this time, and it is very evident that they share a very special bond. I am confident that their relationship will be lifelong.

I am very proud to be such a close friend to Peter. He is my oldest friend, and I know we will be lifelong friends. The distance between us, with Peter living in Australia, has not been a barrier to our friendship, and we have managed to keep in touch regularly. If six months go by before we speak to each other, it is like carrying on the conversation we started six months ago. An indication perhaps of how well we know each other. Life is full of twists and turns, and it is with all credit to Peter, that practically all of his friends are supporting him during this difficult time. I for one, will be ready to support him in his life after this difficult time.

Should there be anything else that I personally can help you with, then please do be in touch. Should it be necessary for me to attend any court hearing, then I will do all in my power to make myself available.

Yours Sincerely,

Mr. Charles J Tucker.



**Walters Green**
Clinical Psychology Practice
ABN 23 562 819 038

● Level 3, 54 Jephson St, **TOOWONG**, QLD, 4066
T / **(07) 3870 8191**      F / (07) 3720 8793

● Level 1, 531 Sandgate Rd, **CLAYFIELD**, QLD, 4011
T / **(07) 3262 5903**      F / (07) 3862 4596

PO Box 1459, TOOWONG BC, QLD, 4066

10 April 2015

**DIRECTORS**
Dr David Walters   Dr Angela Green

**CLINICAL PSYCHOLOGISTS**
Dr Jonathan Andrews
Dr Karina Bate
Dr Matthew Currell
Dr Angela Green
Dr Madeline Farmer (Registrar)
Dr Louise Kelso
Dr Amy Kwan
Dr Brooke Stemm
Dr Sarah Stirling
Dr Mark Wainwright
Dr David Walters

Hon. Judge Thomas P.  Griesa
Unites States District Judge
United States Courthouse
500 Pearl St
NEW YORK  10007-1312

**VISITING CONSULTANT
PSYCHIATRISTS**
Dr Vanessa Johnson
Dr Kailas Roberts
Dr Amanda Taylor

**PRACTICE MANAGER**
Shantyl O'Donnell

Re: Peter Phillip Nash,

**RECEPTIONISTS**
Brittany Lavin
Leah Sutcliffe

Dear Judge Griesa,

I write to confirm that there are Clinical Psychologist's within our
practice who treat addictions and are available to treat Peter
Phillip Nash upon his return to Brisbane.

Yours sincerely,

Dr David Walters
Clinical Psychologist

1

PO Box 855
Mount Ommaney – Queensland
Australia – 4074

30th September 2014

Dear Judge Griesa

I met Peter Nash for the first time in 2011 at the Forensic Disability Service, where I was interviewed by him for my current position.

The first year and half I worked on the floor as a shift worker, and since yearly 2013 I have been working with the programmes team during office hours (no longer as a shift worker, but 8.00-16.00hrs, Monday - Friday). My work station was only few steps from Peter Nash's office, when I joined the programmes team.

Peter was the senior manager at FDS, and as such he performed his role with utmost care and diligence not only for the clients but also his staff.

As a boss, Peter was always very caring and supportive of his staff. I can't remember a time when he refused to see me when I needed guidance or assurance.

There were times that my family experienced personal crisis, and Peter was always very caring and understanding that I might need some time off work to deal with the situations. One example that comes to mind is when my youngest daughter had a car accident when I was at work, and was taken to the hospital by ambulance. As soon as I mentioned to Peter what had happened he was rather happy for me to attend to her, and told me to take as much time that I needed to assist her in whatever she needed. I saw similar attitude towards my colleagues when they also were facing some very challenging times in their lives. Peter organised a card and flowers to be sent to one of my colleagues during a very difficult time in her life.

It was delightful to see his interactions with our clients. I never heard or saw Peter mistreating any of them. In fact, he always showed care and compassion for their needs and their sufferings.

Peter made me feel valued as an employee, and demonstrated his appreciation for my contributions to the team either verbally or via an email.

Peter and I were at one training at work one day, and we had to divide into groups for one of the activities. Peter and I ended up in the same group, and on that day whilst we were working on a task, sitting on the floor, I was able to notice how gentle and caring he was. We had to come up with suggestions and share how we felt about a particular topic. All I could think of during that task was how kind Peter was, because I could see genuine concern for subject being discussed.

Peter never belittled or discriminated me or my work; on the contrary he made sure to acknowledge my achievements by stating that he valued my time and effort to making the team successful.

**Page 1 of 2**

Peter had the ability to bring laughter to work.  Lunch time was always fun when Peter was around. I miss having Peter around not only because he was able to bring a smile to the workplace, but because there were so many times that I wished I had his opinion and guidance about certain matters.  Until now, when I'm not sure about my next step, I think about Peter and I wish that I could get a simple a straight answer to what I need to do.

My hope is to one day have the opportunity to work alongside Peter once again, because he is a genuine, no nonsense person who does not reserve good things to those in need of hand.  Also, Peter has always been very supportive, and as such he always put the needs and concerns of his staff as a matter of priority, which made me feel confident to perform well all my duties at work.

Yours sincerely

Claudineia Wong.

Page 2 of 2