UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   v.

PETER PHILLIP NASH,
  a/k/a "Samesamebutdifferent,"
  a/k/a "Batman73,"
  a/k/a "Symmetry,"
  a/k/a "Anonymousasshit,"

      Defendant.

S1 13 Cr. 950-3 (TPG)

## GOVERNMENT SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorney
- Of Counsel –



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 22, 2015

By ECF
Hon. Thomas P. Griesa
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

      Re:      *United States v. Peter Phillip Nash*
                  13 Cr. 950 (TPG)

Dear Judge Griesa:

        The Government writes respectfully in advance of the sentencing of Peter Phillip Nash, scheduled for May 26, 2015, at 4:30 p.m. As detailed in the Presentence Report ("PSR") prepared by the Probation Office, from January to October 2013, Nash worked as a paid staff member of a massive online drug-trafficking business known as "Silk Road." Due to the huge quantities of drugs distributed through this Internet-based narcotics conspiracy, Nash's recommended sentencing range under the United States Sentencing Guidelines ("U.S.S.G.") is 121 to 151 months' imprisonment. As explained below, in light of Nash's relatively minor role in the operation of Silk Road, as well as other mitigating factors unique to Nash, the Government believes that a substantial sentence of imprisonment below the applicable Guidelines range is warranted.

## BACKGROUND

**A.**    **The Silk Road Website**

        As explained more fully in the PSR, the Silk Road website was a vast online black market that operated from early 2011 until October 2013, when it was shut down by law enforcement. (PSR ¶ 15). The website was designed to make conducting illegal transactions on the Internet as easy and frictionless as shopping online at mainstream e-commerce websites. (PSR ¶ 20). The vast majority of the goods for sale on Silk Road consisted of illegal drugs of every conceivable variety, which were openly advertised on the site as such and were immediately and prominently visible on the site's home page. (PSR ¶ 26.) A screenshot of the Silk Road home page as of October 2, 2013, the day the website was shut down, is attached hereto as Exhibit A. As it reflects, by that time Silk Road had over 13,000 listings for illegal

drugs, offered for sale by various "vendors" – drug dealers – using the site's sales portal. A sample Silk Road listing, for heroin, is attached as Exhibit B. Upon viewing a listing such as this, a Silk Road user could simply click "add to cart" to pay for the product electronically and thereafter have the product shipped to their doorstep. (PSR ¶ 25). The site also sold other forms of contraband besides drugs, including, for example, fake IDs and passports as well as computer-hacking tools and services. (PSR ¶¶ 29-32).

The scope of the criminal activity supported through Silk Road was staggering. In the course of its investigation, the Government was able to seize the computers used to run Silk Road, which contained a database of all the transactions effected on the site. The records from that database show that, in total, over 1.5 million sales transactions were conducted over Silk Road, involving over 100,000 buyer accounts and nearly 4,000 seller accounts. (PSR ¶ 43, 46.) The value of those sales totaled $214 million in U.S. currency. (PSR ¶ 43). The vast majority of the sales were of illegal drugs – including at least $8.9 million in sales of heroin, $17.3 million in sales of cocaine, and $8.1 million in sales of methamphetamine. (PSR ¶ 44-45). The dealers and buyers involved in these transactions were spread across the world, from Argentina to Australia, from the United States to the Ukraine. (PSR ¶ 46). Essentially, Silk Road made it possible for anyone anywhere to buy any illegal drug of their choosing. All they needed was a computer and a shipping address.

Unlike ordinary websites, Silk Road was only accessible on the "Tor network," a special network on the Internet designed to conceal the location of the computers on the network, and, thereby, the identities of its users. (PSR ¶¶ 21-22). Further, Silk Road required all purchases to be made using an anonymous form of "digital currency" known as "Bitcoin," which allowed money to flow into and out of the site without leaving behind any traditional financial trail. (PSR ¶¶ 33-38). The use of these anonymizing technologies was specifically designed to facilitate the criminal activity taking place on Silk Road and made it exceptionally difficult for law enforcement to shut down the website and identify and arrest the people running it.

**B.     Nash's Role on Silk Road**

The Government's investigation revealed that the Silk Road website was created and operated by a U.S. citizen named Ross Ulbricht. He was arrested in San Francisco, California, on October 1, 2013. Following a four-week trial before the Honorable Katherine B. Forrest in February 2015, Ulbricht was convicted on all counts of a seven-count indictment, including charges of conspiring to commit drug trafficking and money laundering. (PSR ¶¶ 12, 41).

Ulbricht oversaw and managed all aspects of Silk Road during the course of its operation. (PSR ¶ 16). He designed the site to facilitate illegal transactions and to insulate the sellers and buyers involved from the reach of law enforcement. He also designed the site to ensure that he got a cut from every sale. (PSR ¶ 17). The Bitcoin-based escrow payment system he built into it automatically collected a sizable commission every time a sale was processed. (PSR ¶¶ 38-39). Ulbricht forbade users from arranging deals outside that escrow system in order to avoid paying commissions to Silk Road – a rule that he actively enforced by terminating the account of any user who was caught engaging in this practice. (PSR ¶ 40).

While Ulbricht launched Silk Road by himself, the site ultimately grew far too large for him to run singlehandedly.  As a result, he eventually hired a number of employees to assist him, including an online customer support staff, consisting of "site administrators" and "forum moderators."  (PSR ¶ 47).  Ulbricht recruited these employees over the website and managed them online; he did not work with them in person.  (*Id.*)  Nor did the employees know his true identity; they knew him only by his online moniker on Silk Road – "Dread Pirate Roberts."  (PSR ¶ 48).

The composition of Ulbricht's customer support staff changed over time.  (*Id.*)  At the time of Ulbricht's arrest in October 2013, there were four members of his customer support staff.  One was an undercover law enforcement agent.  The three others were the defendants named in the indictment in this case: Andrew Michael Jones, Gary Davis, and Nash.  (*Id.*)

As between these three defendants, Jones and Davis had the more substantial roles.  They were both "site administrators."  In that position, they responded to customer support requests from Silk Road users who needed assistance with their buyer or seller accounts on the Silk Road marketplace.  A basic customer support inquiry might involve a situation where a user claimed to have forgotten his account password and needed it reset.  Other customer support inquiries were more complex.  In particular, Jones and Davis acted as arbitrators between drug dealers and buyers on the site, resolving disputes that would arise, for example, when a buyer would claim not to have received the drugs he had ordered on the site and was refusing to release payment to the vendor.  (PSR ¶ 49).  Beyond resolving such disputes, Jones and Davis would also enforce the rules for doing business on Silk Road, set by Ulbricht.  In particular, they would watch for violations of Ulbricht's rule against "out of escrow" sales – *i.e.*, sellers and buyers arranging payments off the site to avoid paying Silk Road commissions.  When violations of this rule were discovered, Jones or Davis could terminate the vendor's account or otherwise restrict the vendor's privileges, and would typically report the incident to Ulbricht.  (PSR ¶ 50).

Nash occupied a different role on the Silk Road customer support staff from Jones and Davis; he was a "forum moderator."  In that role, Nash helped maintain the Silk Road discussion forums – a part of Silk Road where users could post messages to "discussion threads" concerning various topics related to the website.  (PSR ¶¶ 18, 24, 51).  The forums were an important part of Silk Road's customer support system, as it was on the forums that users would get advice on how to do business on Silk Road, including, specifically, how to minimize the risk of detection by law enforcement.  (PSR ¶ 51).  Nash kept the forums organized, removing discussion threads that did not belong where they were posted and locking the accounts of users who violated the discussion forum's rules – thus keeping the forums functional and orderly for Silk Road users, which Ulbricht was too busy to do himself.  (*Id.*).

Nash also served as Ulbricht's eyes and ears on the discussion forums, monitoring them for any user communications that he thought Ulbricht or the site administrators should know about.  (PSR ¶ 52)  For example, if Nash observed any posts by any user whom he suspected of being an undercover law enforcement agent, he would report his suspicions to Ulbricht and the site administrators.  (*Id.*)  Nash would also keep Ulbricht and the site administrators apprised of: any sellers on the forum who were attempting to conduct deals without paying commissions to

Silk Road (by arranging their transactions through messages on the forum rather than going through the marketplace payment system); any glitches forum users were reporting with the Silk Road website; any complaints they were making about scams being perpetrated on the website; and any rumors spreading on the forum about "Dread Pirate Roberts" (*i.e.*, Ulbricht) or the Silk Road website. (*Id.*) Nash filed "weekly reports" with "Dread Pirate Roberts" notifying him of any issues along these lines. (*Id.*)

Nash also regularly responded to questions on the forum from Silk Road users, including advising users on how to evade law enforcement. (PSR ¶ 53). For example, in one posting dated February 26, 2013, Nash posted to a discussion thread concerning how vendors could evade narcotics detection efforts by customs authorities. Nash reported that "Australian customs claim they inspect all international mail, either visually, with canine detection, or a scanner." He advised, however, that so long as vendors prepared their shipments "using non vapor permeable methods (i.e., dog proof)," then the "chances of them putting it through a scanner" are "approximately nil." Nash urged Silk Road vendors to "[s]tep it up" with such packaging methods and promised that if they did so "the seizure rates will drop off significantly." (*Id.*)

Nash served as a forum moderator for Ulbricht from January 2013 to October 2013.[1] (PSR ¶ 19). Jones, Davis, and Nash were all paid weekly salaries for their work on Silk Road. By the time that Ulbricht was arrested, Jones and Davis were being paid $1,500 a week for their role as site administrators, while Nash was being paid $1,000 a week for his role as a forum moderator. (PSR ¶ 55).

### C.   Nash's Safety Valve Proffer and Plea

On September 17, 2014, Nash provided information to the Government in order to receive safety valve relief. Nash truthfully answered all questions asked of him concerning his offense conduct to the Government's satisfaction. Notably, Nash stated in his proffer that he developed a cocaine addiction while living in the United Kingdom, but that when he moved to Australia in 2009, he found cocaine very hard to obtain due to Australia's tight border control; consequently, he largely ceased using it. Upon discovering Silk Road in 2012, however, it became easy for Nash to obtain as much cocaine as he wanted by ordering it from the website and having it delivered by mail; he became addicted again as a result. Fueled by Silk Road, Nash's cocaine habit eventually spiraled out of control, with serious deleterious consequences for his work and home life – as Nash himself details in his letter to the Court accompanying his sentencing submission. (Def. Mem., Ex. B at 2).

On March 13, 2015, Nash pled guilty to conspiring to commit drug trafficking and money laundering as a paid Silk Road staff member. Nash specifically acknowledged that the drug-trafficking conspiracy involved quantities of drugs sufficient to trigger the 10-year mandatory minimum penalty enhancement of 21 U.S.C. § 841(b)(1)(A). (Tr. dated Mar. 13, 2015, at 14).

---

[1] Nash briefly was promoted to the role of a site administrator in May 2013, but after a few weeks, Ulbricht decided to move him back to the role of forum moderator. (PSR at 30).

However, because Nash meets the criteria for safety valve relief set forth in 18 U.S.C. § 3553(f), the mandatory minimum does not apply.

### D.    Guidelines Calculation

As set forth in the PSR, Nash's base offense level under the Guidelines is 36, based on the many kilograms of drugs distributed as part of the conspiracy to which he pled guilty. (PSR ¶ 82). The PSR applies a two-level enhancement based on the fact that the conspiracy distributed controlled substances through mass-marketing by means of the Internet. (PSR ¶ 84). The PSR applies a further two-level enhancement because the conspiracy involved money laundering, and a separate two-level enhancement because the money laundering was sophisticated. (PSR ¶¶ 86-87).

The PSR reflects that Nash's offense level is decreased by three levels, however, based on the fact that he played a minor role in the offense, and decreased by another two levels, based on the fact that he played a minor role in a conspiracy involving large quantities of drugs, *see* U.S.S.G. § 2D1.1(a)(5). (PSR ¶¶ 83, 89). Nash's offense level is decreased another two levels based on his safety valve eligibility. (PSR ¶ 85). Finally, Nash's offense level is decreased three more levels based on his timely acceptance of responsibility. (PSR ¶¶ 93-94).

Accordingly, the PSR calculates Nash's total offense level to be 32. (PSR ¶ 32). At criminal history category I, this offense level results in a Guidelines range of 121 to 151 months' imprisonment. (PSR at 32).

### DISCUSSION

### A.    Nash's Factual Objections to the PSR

Nash raises a number of factual objections to the PSR, several of which concern the PSR's characterization of his role on Silk Road. (Def. Mem. 3-5). These objections lack merit.

First, Nash objects to the PSR's claim that he was part of the Silk Road "customer support staff," appearing to take the position that only site administrators such as Jones and Davis qualify as such. (Def. Mem. 3). However, the characterization is accurate. Silk Road's forum moderators were explicitly characterized as part of the site's customer support system on Silk Road itself. For example, the Silk Road homepage had a link at the bottom labeled "support." (*See* Ex. A). Clicking on the link brought up a webpage that led users to Silk Road's different customer support options; a screenshot of that page is attached hereto as Exhibit C. As it makes clear, the Silk Road discussion forum – which was Nash's responsibility to maintain – was part of the site's customer support system. The page even instructs users that if they post a "customer support" question in the forum, "[o]ne of our forum moderators or senior members will be there to guide you, usually responding within 24 hours."[2]

---

[2] Nash also objects to being characterized as the "primary moderator" on the Silk Road discussion forums. (Def. Mem. 3), but that is precisely how Ulbricht, the site operator, referred

Second, Nash objects that the PSR fails to make clear that the Silk Road discussion forum he helped maintain was hosted on a different computer server from the Silk Road "marketplace" – *i.e.*, the area of Silk Road where drugs were bought and sold. (Def. Mem. 3-4). That is true, but the discussion forum and marketplace were nonetheless both part of the same illegal enterprise. Again, the discussion forum was an important aspect of Silk Road's customer support system and guided users on how to conduct illicit transactions on the Silk Road marketplace. Thus, Nash's work as a forum moderator helped sustain Silk Road's drug-trafficking business as a whole.

Third, Nash objects to the PSR's assertion that part of his role was to look out for any users of the Silk Road discussion forum who he suspected were undercover law-enforcement agents. (Def. Mem. 4). However, Nash's communications with Ulbricht and his fellow customer support staff members plainly include such reports from Nash. A selection of these communications is attached as Exhibit D.

The remaining objections Nash makes to the PSR, (Def. Mem. 3-5), either are in the nature of legal objections, addressed below, or do not raise substantial issues disputed by the parties.

**B.   Nash's Legal Objections to the PSR's Guidelines Calculation**

Nash makes several legal objections to the Guidelines calculation set forth in the PSR. These objections, too, are meritless.

**1.   The PSR's Guidelines Calculation Properly Reflects the Total Quantities of Drugs Involved in the Narcotics Conspiracy to which Nash Pled Guilty**

Nash's principal objection to the PSR's Guidelines calculation is that it is based on the total quantity of drugs distributed through Silk Road. Nash argues that the calculation should be based instead on the far smaller quantity of drugs that Nash himself purchased from Silk Road for his own personal consumption, claiming that these are the only drug sales on Silk Road in which he directly participated. (Def. Mem. 4, 24-28).

However, Nash is not charged in connection with his own personal purchases of drugs from Silk Road. He is charged with, and has pled guilty to, participating in a conspiracy to sell drugs – by agreeing with others to operate Silk Road. Nash participated in this conspiracy knowing full well that Silk Road was a massive online marketplace for illegal drugs. Although he played a relatively minor role in its operation, that does not detract from the fact that Silk

---

to him. Thus, when Ulbricht returned Nash to his moderator position after briefly promoting him to a site administrator, *see supra* n.1, Ulbricht told Nash in a June 5, 2013 message: "I'm going to move you back to being the primary mod on the forums. I'm going to keep paying you $1k/wk though . . . . How does that sound? Be my forum mod?"

Road facilitated the distribution of huge drug quantities – a fact that was clearly foreseeable to Nash at the time.[3]

It is black-letter law under the Guidelines that someone who takes part in jointly undertaken criminal activity is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, for purposes of calculating the applicable Guidelines range, the relevant drug quantities are the quantities of drugs Nash had reason to know were being distributed through the online drug-trafficking business he was helping to operate. Of course, the Court may choose to impose a sentence below the applicable Guidelines range in the event that the Court concludes that it overstates Nash's level of culpability. But in calculating the correct Guidelines range in the first place, the Court must look to the total quantities of drugs distributed through the conspiracy at issue in determining the base offense level. The small quantities of drugs that Nash bought for himself on Silk Road are irrelevant, except insofar as they provide further evidence that Nash understood that drugs were widely bought and sold on Silk Road. *See United States v. Payne*, 591 F.3d 46, 70-71 (2d Cir. 2010) (rejecting defendant's argument that he was accountable only for quantities of crack cocaine "attributable to [him], as opposed to the conspiracy in general"); *see also United States v. Lara*, 47 F.3d 60, 67 (2d Cir. 1995) (noting that district court properly calculated total offense level based on total aggregate quantities foreseeable to the defendants, while reasonably departing downward because offense level overstated their culpability given their limited roles).[4]

---

[3] The law is clear that a defendant need not have personally sold, bought, possessed, or otherwise have come into direct contact with any illegal drugs in order to be a member of a narcotics conspiracy. Indeed, "a variety of conduct, apart from selling [drugs], can constitute participation in a conspiracy sufficient to sustain a conviction." *United States v. Burgos*, 94 F.3d 849, 859 (4th Cir. 1996); *see also United States v. Polk*, 715 F.3d 238, 246 (8th Cir. 2013) (holding that defendant "need not have actually manufactured, harvested, or distributed the [drugs] to be a member of the conspiracy"); *United States v. Cole*, 423 F. App'x 452, 459 (5th Cir. 2011) ("[T]here are many different roles that participants in a drug conspiracy may play, for example: supervisor and manager, distributor, collector, courier, gunman and enforcer . . . ."); *United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) (quoting *United States v. Soto–Beníquez*, 356 F.3d 1, 18 (1st Cir. 2004)) (holding that even the performance of "ancillary functions" can be sufficient to "advance[e] the aim of a narcotics conspiracy"); *United States v. Jenkins*, 419 F.3d 614, 620 (7th Cir. 2005) ("Different people play different roles in a drug conspiracy, be it supplier, lookout, courier, or enforcer."); *United States v. Martines-Chaves*, 131 Fed. App'x 151, 157 (11th Cir. 2005) ("[T]o join a conspiracy to distribute drugs, a defendant need not actually agree to sell the drugs himself."); *United States v. Garcia–Torres*, 280 F.3d 1, 4 (1st Cir. 2002) ("[A] drug conspiracy may involve ancillary functions (e.g., accounting, communications, strong-arm enforcement), and one who joined with drug dealers to perform one of those functions could be deemed a drug conspirator.").

[4] Nash also argues that, even if the Guidelines calculation should be based on the total quantities of drugs distributed through Silk Road, he can only be held accountable for the quantities distributed after he joined the conspiracy in January 2013. Even if this adjustment were made, however, it would have no impact on the Guidelines calculation. (PSR at 30). Notably, Silk

Page 8

### 2. The PSR Properly Applies an Enhancement for Distributing Drugs through Mass-Marketing by Means of the Internet

Nash also objects to the two-level enhancement included in the PSR's Guidelines calculation pursuant to U.S.S.G. § 2D1.1(b)(7), which applies where the defendant is involved in distributing controlled substances "through mass-marketing by means of an interactive computer service." (Def. Mem. 29-30). The enhancement plainly applies.

As the accompanying application note states, the mass-marketing enhancement applies to "the solicitation, by means of an interactive computer service, of a large number of persons to induce those persons to purchase a controlled substance." U.S.S.G. § 2D1.1, application note 13. The Sentencing Commission has further explained the rationale for the enhancement:

> The Commission identified use of an interactive computer service as a tool providing easier access to illegal products. Use of an interactive computer service enables drug traffickers to market their illegal products more efficiently and anonymously to a wider audience than through traditional drug trafficking means, while making it more difficult for law enforcement authorities to discover the offense and apprehend the offenders.

U.S.S.G. app. C (Vol. III), amend. 667, reason for amend. ¶ 2. That is precisely what Silk Road did – it enabled drug dealers to solicit customers over the Internet, thereby spreading their reach to a wider market, while simultaneously helping them to evade detection by law enforcement.

Nash's argument that Silk Road merely engaged in "sales" of drugs and was not used for "marketing," (Def. Mem. 29-30), is baseless. The only way that drug dealers were able to sell drugs on Silk Road was by advertising their products on the site – which they did on their "vendor pages," as reflected in Exhibit B. The enhancement does not require any more specialized form of "marketing" than that. *See United States v. Hanny*, 509 F.3d 916, 920 (8th Cir. 2007) ("A public, interactive website reachable by an ordinary web search engine is, at the least, a billboard on the information superhighway. As operated, the [defendant's] site not only allowed the general public to read the products offered for sale, but the site also allowed visitors to actively shop for, select, and purchase controlled substances. Operation of an illegal internet pharmacy of this variety through an interactive website is sufficient conduct to warrant the application of U.S.S.G. § 2D1.1(b)(5)."); *see also* Merriam-Webster Dictionary (defining "marketing" as "the process or technique of promoting, selling, and distributing a product or service"), *available at* http://www.merriam-webster.com/dictionary/marketing.[5]

---

Road grew over time and its 2013 sales volume well outpaced its sales volume from prior years. Applying a conservative methodology, the Government has calculated the quantities of drugs distributed through Silk Road from January 2013 to October 2013, and the resulting quantities still result in a base offense level of 36.

[5] Not that it necessarily matters, but vendor advertisements on Silk Road *were* accessible to the general public – contrary to Nash's claim that "because of security protocols and encryption, members of the general public were not able to access the [Silk Road] website," (Def. Mem. 30). In fact, the Silk Road website was easily accessible to any member of the public with an Internet

### 3. The PSR Properly Applies an Enhancement for Sophisticated Money Laundering

Finally, Nash objects to the PSR's application of a two-level enhancement for sophisticated money laundering pursuant to U.S.S.G. § 2S1.1(b)(3). (Def. Mem. 30-31). Again, the objection is meritless; the enhancement is applicable.

By design, Silk Road functioned to launder the proceeds of the drug dealers and other criminals using the site to do business. As the PSR explains in detail, the site required all payments to be made in the form of Bitcoins – a digital currency designed to be as anonymous as cash. (PSR ¶ 34). As a result, drug dealers were able to take the proceeds they received from their Silk Road sales and convert them to ordinary currency – through so-called Bitcoin "exchangers" – without leaving any traditional financial trail that would reveal the source or nature of the funds. (PSR ¶¶ 33-38). The only record of the movement of the funds would appear on a public ledger of all Bitcoin transactions maintained as part of the Bitcoin network, known as the "Blockchain." That ledger, however, reflects only the movement of Bitcoins from one anonymous Bitcoin account to another. Nothing about the ledger records would reflect any association with Silk Road or Silk Road users. (PSR ¶¶ 35-36).[6]

Moreover, Silk Road used a so-called Bitcoin "tumbler" to further frustrate any attempt to track funds back to drug transactions on the site. As explained in online guidance that Silk Road provided to its users, Silk Road's tumbler "sen[t] all payments through a complex, semi-random series of dummy transactions . . . making it nearly impossible to link your payment with any coins leaving the site." In other words, if a buyer made a payment to a vendor on Silk Road, the tumbler obscured any link between the buyer's Bitcoin account and the vendor's Bitcoin account where the Bitcoins would end up – making it difficult for law enforcement to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's and vendor's Bitcoin accounts were both known to law enforcement. (PSR ¶ 39).

These money-laundering features of Silk Road were much more sophisticated than more typical money laundering methods used in a run-of-the-mill narcotics conspiracy. Nash argues that these features are not sufficient to trigger the enhancement for sophisticated money laundering because they do not include any of the specific examples of sophisticated money laundering specifically referenced in the application note accompanying the enhancement. (Def. Mem. 31). But there are many ways a money laundering operation can qualify as "sophisticated"; the list in the application note is not meant to be exhaustive. *See United States v. Fish*, 731 F.3d 277, 280-81 (3d Cir. 2013) (holding that the application note factors "are

---

connection. While the Silk Road website was hosted on a special part of the Internet known as the "Tor network," the Tor network is simple to use and can be accessed using free and readily available software. (PSR ¶ 22).

[6] A printout of a sample Bitcoin transaction as reflected on the Blockchain is attached as Exhibit E. The record shows funds from one Bitcoin account (known as a Bitcoin "address") being transferred into two others.

illustrative but not required," and finding that sophistication enhancement applied to money laundering scheme involving, *inter alia*, "efforts to evade detection by the use of codes and untraceable electronic devices").

Moreover, the Silk Road payment system did in fact include one of the specific examples of sophistication referenced in the application note: the layering of transactions. *See* U.S.S.G. § 2S1.1, application note 5. Silk Road's Bitcoin "tumbler" was specifically designed to create layers of sham transactions in order to obfuscate the source of the proceeds that drug dealers were withdrawing from the site. This aspect of Silk Road's money-laundering system is sufficient by itself to trigger the sophistication enhancement. *See, e.g.*, *Untied States v. Pizano*, 421 F.3d 707, 731 (8th Cir. 2005) (holding that the district court did not err in applying the sophisticated laundering enhancement "because the district court found that the [defendant] engaged in layering"); *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) (affirming the application of the enhancement because "[w]hen an individual attempts to launder money through 'two or more levels of transactions,' the commentary clearly subjects an individual to the sophisticated laundering enhancement"); *Venkataram v. United States*, No. 11 Cr. 102 (RPP), 2013 WL 5298461, at *9 (S.D.N.Y. Sept. 20, 2013) (sophisticated money laundering enhancement appropriate where conduct involved multiple levels of transactions and transfers).

### C. Government's Sentencing Recommendation

As set forth above, the Guidelines calculation set forth in the PSR is correct. In accordance with that calculation, Nash faces a Guidelines range of 121-151 months. This sentencing range reflects the extremely serious nature of the conspiracy in which Nash participated. That conspiracy resulted in the distribution of approximately $200 million worth of illegal drugs to well over 100,000 buyers across the world – with predictably harmful (and in some cases even deadly) consequences, as the PSR makes clear. (PSR ¶¶ 56-73). The conspiracy leveraged the Internet to enable drug dealers to vastly expand their territorial reach, while at the same time helping them to evade detection by law enforcement. Similarly, the conspiracy utilized a sophisticated digital payment system to facilitate the laundering of hundreds of millions of dollars in criminal proceeds. In light of these aggravating factors, the Guidelines appropriately call for a stiff sentence reflecting the seriousness of the offense and the need for general deterrence.

Nonetheless, the Government believes that a below-Guidelines sentence is warranted as to the specific defendant at bar. Nash played a relatively minor role in the operation of Silk Road – obviously far less significant than the central role played by Ulbricht, but even less significant than the roles of the site administrators who are Nash's co-defendants in this case. Nash played a role somewhere between a "steerer" – insofar as he helped users navigate their way to finding drugs on Silk Road – and a lookout – insofar as he kept the boss (Ulbricht) apprised of things he should know. But Nash was not directly involved in facilitating or mediating specific drug transactions, as were the site administrators. Also unlike the site administrators, Nash did not have administrative access to users' accounts on the Silk Road marketplace, which users needed to buy or sell drugs through Silk Road. (Users' accounts on the Silk Road discussion forum were separate). Thus, while Nash's role on Silk Road was not

unimportant, its connection to the actual drug trafficking taking place on the site was significantly attenuated, compared to the conduct of his co-conspirators.

There are other mitigating factors to consider in sentencing Nash. Most significantly, Nash's criminal conduct in this case appears to be an aberration. Aside from periods of personal drug use, there is no indication that Nash has previously been involved in drug trafficking or that he is likely to return to such criminal activity in the future. To the contrary, Nash's lengthy and impressive employment history shows that he has spent most of his working life contributing generously to society, as a social worker focused on helping populations with physical and intellectual disabilities. Moreover, Nash's successful completion of a drug abuse treatment program and multiple other rehabilitative courses during his imprisonment in this case evidences a commitment to avoiding future drug use and rebuilding a productive life upon release. It also appears that Nash has a well-developed support network to help him achieve these goals.

Accordingly, given Nash's unique circumstances – both in terms of his low-level role and his mitigating personal factors – the Government believes that a below-Guidelines sentence is appropriate.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a substantial prison sentence, but one below the Guidelines range, is sufficient in this case to achieve the objectives of sentencing.

Respectfully,

PREET BHARARA
United States Attorney

By: _____
SERRIN TURNER
TIMOTHY T. HOWARD
Assistant United States Attorneys